15 Cal.Rptr.3d 530 (2004)
120 Cal.App.4th 521
In re MIGUEL E. et al., Persons Coming Under the Juvenile Court Law.
San Diego County Health and Human Services Agency, Plaintiff and Respondent,
v.
Leeanna A., Defendant and Appellant.
In re Miguel E. et al., Persons Coming Under the Juvenile Court Law.
San Diego County Health and Human Services Agency, Plaintiff and Respondent,
v.
Leeanna A., Defendant and Respondent;
Deborah V. et al., Objectors and Appellants;
Miguel E., Appellant.
In re Miguel E., a Minor, on Habeas Corpus.
Nos. D042403, D042787, D043040.
Court of Appeal, Fourth District, Division One.
July 8, 2004.
Review Denied September 29, 2004.[*]
*533 Linda M. Fabian, under appointment by the Court of Appeal, for Defendant and Appellant and for Defendant and Respondent.
Suzanne F. Evans, San Diego, under appointment by the Court of Appeal, for Objectors and Appellants.
Andrea R. St. Julian, San Diego, under appointment by the Court of Appeal, for Appellant, for Petitioner Miguel E. and for Minors.
John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.
HUFFMAN, J.
These proceedings concern three children: Miguel E., born in September 1995; Aaron A., born in August 2000; and C.A. A., born in June 2002. Their mother, Leeanna A. (Mother), along with Miguel and the children's maternal grandmother and maternal step-grandfather, Deborah and John V. (individually, Grandmother and Grandfather; together, Grandparents),[1] appeal the June 17, 2003 order removing all three children from Grandmother pursuant to Welfare and Institutions Code section 387.[2] Appellants contend the removal was erroneous for numerous reasons. Mother additionally contends that, in Aaron's case, the court failed to comply with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). Miguel has filed a petition for writ of habeas corpus seeking relief from the purportedly untimely filing of his notice of appeal. The Agency has filed two dismissal motions: the first requests that Miguel's appeal be dismissed as untimely and Grandparents' appeal be dismissed for lack of standing; the second requests that all the appeals be dismissed as to C.A.
We deny Miguel's petition as moot and dismiss Grandparents' appeal for lack of standing. Because the section 387 and ICWA issues are meritorious, we reverse the section 387 order, remand for a new section 387 hearing at which the juvenile court shall properly exercise its discretion, and reverse in Aaron's case and remand for proper ICWA notice.

I.

THE INCEPTION OF THE DEPENDENCIES
In July 2001, the San Diego County Health and Human Services Agency (the Agency) filed dependency petitions for five-year-old Miguel and 10-month-old Aaron. The petitions alleged Mother used marijuana to excess and had been seen blowing smoke in Aaron's face and Miguel tested presumptively positive for marijuana. Miguel and Aaron were detained in Polinsky Children's Center and then, on July 16, with Grandmother, who had cared for them previously.
In September, the petitions were amended by adding allegations that Mother left Miguel unattended outside their home on numerous occasions between the *534 hours of 10:00 p.m. and 12:00 a.m. The juvenile court dismissed the allegations in the original petitions and made true findings on the new allegations. It placed both boys with Grandmother on the Agency's recommendation.
When C.A. was born in June 2002, the Agency filed a petition alleging (1) Mother had a mental illness, including adjustment disorder with anxiety and depressed mood with parent-child relational problems, rendering her unable of providing regular care; and (2) she had failed to progress in services following the true finding in Miguel's case. On June 15, C.A. was detained in Grandmother's approved home. In July, the court dismissed the first allegation of C.A.'s petition and made a true finding on the second. In August, the court placed her with Grandmother on the Agency's recommendation.

II.

THE PLACEMENT WITH GRANDMOTHER
In June 2001, just before the original dependency petitions were filed, Psychologist Steven Sparta evaluated Miguel, apparently in conjunction with a family court case. Dr. Sparta noted in Miguel "an underlying sense of instability and insecurity with anticipatory anxiety about future disruptions in his ability to maintain an attachment with caretakers." Dr. Sparta conferred with Miguel's attorney "about the importance for Miguel to have a stable and sustained family history." Dr. Sparta believed it was very important that Miguel experience stability and emotional support "and a continuing opportunity to not change schools, to form other social and familial attachments."
From the beginning of the case, the Agency's reports regarding the children's placement with Grandmother were positive. Throughout 2002, the Agency described the home as "appropriate" and noted that Grandmother "provide[d] adequate care." In May, however, an Agency report referred to Mother's "family background" as a factor "elevat[ing] her potential for child abuse," and a July report noted: "[Mother] reported issues of domestic violence, physical abuse and sexual abuse during her childhood. She stated that she was responsible for the care of her siblings when she was younger and had reported her mother to CPS where they were once dependents."
According to the boys' March 2002 six-month review report, Aaron was "progressing very well." While Miguel's school performance had improved, he continued to have difficulty and was working below grade level. Grandmother "continue[d] to assist [him] with his school assignments and [was] making efforts with getting [his] work up to par." Miguel's therapist had diagnosed post traumatic stress disorder (PTSD)[3] but said "Miguel [was] stabilizing in his placement and display[ed] little acting out." Miguel had mild flashbacks, abandonment issues, and occasional nightmares.
According to the boys' September 2002 12-month review report, they had made very good progress developmentally. Miguel's therapist said that he was doing very well and was less anxious, although he did "experience some difficulty with transitions." The therapist believed that Miguel's current school was good for him and that the school staff were "able to support him." Miguel had raised his grades, had been promoted to the next grade level, and had received an outstanding citizenship award. He had "improved *535 immensely academically" and was "excited about attending school."
In Miguel's and Aaron's January 2003 18-month review report, the Agency stated: "For the past year, Miguel and ... Aaron have been able to experience stability, love, care and affection from [Grandparents] who filed a petition in 2001 with Family Court to have Miguel in their care. It was the recommendation of the Family Court that Miguel live with [Grandparents]. This order was countered when the Juvenile Courts became involved with the family and Miguel and Aaron were taken into custody by the Agency." The report noted that the boys had adjusted to Grandmother's home and described her care of them as "excellent." Miguel's therapist observed that his PTSD symptoms had subsided and he was doing well. Miguel continued to attend the same school, was socializing better with his peers, had received good behavior awards, and had "shown exceptional improvement with his grades." The Agency remarked that he had "shown remarkable change while in the care of [Grandparents]." Aaron, whose weight gain had been reported as poor before he was taken into custody, had reached all of his developmental milestones, although there was "some concern regarding his active behavior."
In a letter filed February 24, 2003, Miguel's therapist recommended that Miguel continue living with Grandmother, whose home was "a secure and supportive environment that has helped [Miguel] be successful in school and in the community." The therapist said that Miguel's therapy could conclude over the next few weeks, as he had been "largely symptom-free for the last 90 days."
During a social worker's May 4, 2003 visit to Grandmother's home, Miguel followed Grandmother around the house and engaged in any activity she suggested. When Miguel gave Grandmother a craft he had made in Sunday school, she "doted over the craft and hung it on the wall."[4]
In C.A.'s February 13, 2003 six-month review report, the Agency stated she "seem[ed] to be doing very well in [Grandmother's] home." It concluded that C.A. was "in need of a stable and secure environment so that she can continue to be provided with the excellent care that she has been receiving."
At C.A.'s February 13, 2003, six-month review hearing, the court followed the Agency's recommendations that she continue to be placed in Grandmother's approved home and a 12-month review hearing be set. The court set the hearing for August 14. At Miguel's and Aaron's February 24 18-month review hearing, the court followed the Agency's recommendations that the boys continue to be placed in Grandmother's approved home and that a section 366.26 hearing be set. The court set the hearing for June 24.

III.

THE REMOVAL PROCEEDINGS

A. The Detention and Petitions
On May 30, 2003, the Agency moved the children from Grandmother's home to emergency shelter foster homes, with Miguel and Aaron in one home and C.A. in another. On June 2, the Agency filed section 387 supplemental petitions for the children, alleging "[t]he previous disposition has not been effective in the protection or rehabilitation of the child"; Grandmother was "no longer able to provide adequate care and supervision ... in that: *536 a prior history of CPS [(Child Protective Services)] neglect and abuse was discovered together with statements by [Grandmother] that [Grandfather] suffers from a mental illness." The Agency recommended foster home placement. At the June 2 detention hearing, the court ordered the children detained in Polinsky Children's Center, an approved foster home, or an adjunct.

B. The Detention Report[5]
Concerning the allegation of a CPS history, the Agency's detention report on the section 387 petition stated: "[In t]he previous CPS history from 1989-1990, [Grandmother] was granted joint custody of her ... biological children through a family court order. The reading of this past CPS hist[or]y is complicated by many factors. The reunification services period included substance abuse issues in [Grandmother] and her ex-husband, Mr. A[.] Allegations of sexual abuse existed during the course of reunification. [Grandmother]'s ex-husband from whom she was separated allegedly perpetrated the sexual abuse. The case history reveals that [Mother] was not returned to [Grandmother]'s physical custody by court order." The social worker who had approved Grandmother's home "[had] not [found] a child abuse history in the current system." When Miguel's and Aaron's cases moved to the permanency planning stage, Grandparents requested an adoption home study and a new background check was completed. It was then "discovered in the old system that there was a child abuse history in the home of [Grandmother]"; she "had an open case to CPS that alleged physical abuse of her daughters[, with p]rior abuse allegations includ[ing] domestic violence and physical abuse of her children"; and the daughters had been removed from Grandmother "and eventually placed in their father's care." The Agency concluded there was a risk in the current placement with Grandmother in that she had "a significant child abuse history including the removal of her biological children."
As to the allegation of Grandfather's mental illness, the detention report stated as follows. Grandfather was the primary caregiver and supervised the children while Grandmother worked full time. Grandmother said that Grandfather had schizophrenia. He was unemployed, on disability due to his mental illness, and took medication for that illness. An Agency supervisor had told Grandmother that Grandfather was not to be left alone with the children.
The detention report also mentioned another concern about the placement. Since the original home approval, Grandmother's two biological daughters, who had been living with their father, had moved in, so that the two-bedroom home had nine occupants (including Grandmother's two other biological children,[6] who had been in the home when it was approved). There was clutter and the home's cleanliness was marginal.
In a discussion of the above factors with the social worker, Grandmother said she believed the CPS history was based on false allegations by Mother and asked if a letter from Mother's therapist could clear this up, explaining that Mother had accused her of physical abuse and later recanted in therapy. The social worker cast Grandmother's statements as a "minimization *537 of] her previous CPS history" which "create[d] concerns about [Grandmother]'s denial and minimization of the significant previous reunification issues of physical abuse, domestic violence, substance abuse, sexual abuse." Grandmother also said that Grandfather never forgot to take his medication, loved the children, and was good with them; she was aware of their marginal living standards, recognized that the home was too small and cramped, and planned to "mak[e] improvements such as new paint inside and new flooring to deal with the dirty conditions."
The detention report stated that Miguel was "strongly attached" to Grandmother and apparently regarded her as his primary parent. She was "highly involved in his school progress and therapeutic treatment." The Agency believed "that it will be emotionally detrimental to Miguel to be separated from [Grandmother]." He said he wanted to remain with her. His school reported that he had recently threatened to kill other children, showed a lack of self-esteem, and needed behavioral intervention.
The detention report concluded: "With the current information that there is mental illness, CPS history, and marginal living conditions in this home, the previous licensing home approval is not valid. A reapproval process was initiated upon the realization of this new information. Due to the seriousness of the child abuse history and the fact that [Grandfather] is a primary caregiver with mental illness, the Agency supervisors are unable to approve the home." "Both Aaron and [C.A.] have no ability to protect themselves should an emergency situation arise while under the care of this schizophrenic care provider. Although [Grandmother] reports that [Grandfather] is stable and medicated, he is unable to fulfill the requirements of employment. He has been observed to be socially withdrawn and have poor affect." The Agency requested the children's removal "while more information is pursued through psychological/psychiatric evaluations of both caregivers."[7]

C. The June 10 and 17, 2003 Section 387 Hearings

1. The Social Worker's Testimony

On June 10, 2003, social worker Lakesha Sledge testified as follows. When she was assigned to the case in September 2001, she was aware of Grandmother's CPS history, which Grandmother had disclosed to her. The social worker preceding Sledge, who had detained the children with Grandmother, was also aware of this history. The CPS history was documented in contact logs (also called the case narrative) although the logs did not specify the type of history. Thus, Sledge did not know the extent of the history or whether it involved physical or sexual abuse. In a contact log, a previous social worker had noted that the CPS history had been orally "waivered" and the home approved by former chief Pam Fawcett in July 2001. Approval meant that the placement was deemed suitable and the caregivers were able to provide the children with the necessary care. There was no concern about Grandmother's CPS history or the children's safety.
Between the time Sledge was assigned to the case and the time the children were removed from Grandmother's home, Sledge visited the home a total of 16 to 19 times, once a month for about 30 to 45 minutes. During the visits, the children always seemed appropriately dressed, appropriately cared for, and appropriately developing. Sledge saw no bruises or *538 marks, other than a bruise or mark on Aaron's leg or arm, but he was very active, and there was nothing that led her to suspect any abuse. The home had been cluttered throughout the period of Sledge's supervision. There were about seven people living in the home when she received the case, all relatives, and in the month before the June 2003 hearing, there had been as many as nine residents. Although the two bedroom, one bathroom house was very small, the children's sleeping arrangements were appropriate and Sledge had no doubt that the home met the minimum standards. The children had always done well in Grandmother's care.
When Sledge received the case, she knew that Grandmother was married. Grandfather had been present for 12 of Sledge's visits to the home, she had seen him in court, and she had talked to him. She had no concerns about his behavior and had never heard him say anything that would raise a concern about the children's safety. Until June 2002,[8] when she learned that Grandfather was a paranoid schizophrenic, she had observed no indication that he suffered from a mental illness. When Sledge asked Grandmother if Grandfather was taking medication, Grandmother said yes. Sledge told her supervisor that Grandfather was schizophrenic. Sledge and her supervisor decided to leave the children in the home after Sledge talked to Grandmother and apparently decided that the children were not to be left in Grandfather's care. Sledge did nothing to check on Grandfather's condition in the ensuing year.
In May 2003, Grandmother's home was assessed by the Agency's adoptions unit. At that time, Sledge's supervisor, Diana Conklin, inquired into Grandfather's condition. The Agency learned, apparently from Grandmother, that she was leaving the children alone with him. Sledge did not believe it was appropriate for him to be the children's primary caretaker. She had asked him to sign a release so that the Agency could obtain more information about his mental health status, but he declined. In mid-May, Sledge and Agency supervisors went to Grandmother's home and instructed Grandmother "to not leave the children in the care of [Grandfather] considering his mental health status." After this conversation, the children were found in Grandfather's care "as the only adult provider in the home."[9] As of May 29, however, Grandmother was providing the children's primary care.
In late April or May 2003, Sledge learned the details of Grandmother's CPS history from adoption unit social worker Jamie Rivas and her supervisor Sue Chamberlin. Sledge then consulted with her supervisor; their section chief, Lisa Johnson; Chamberlin; and Rivas, and performed an updated risk assessment. The Agency's position was that there were too many risk factors to leave the children in Grandmother's home and the factors could not be waived. It was determined that the children would be removed. Sledge agreed "to an extent" with that determination. Since she had been assigned to the case, she had always felt that the children were safe in the home. She believed that it was in their best interests to remain there; it would be detrimental to remove them; and there were some risk factors that needed to be remedied, but with a remedy, the children could be safe in the home. Sledge had asked Johnson to *539 sign a waiver, but Johnson had refused. Sledge concluded that it was a risk for the children to be in the home, considering Grandmother's CPS history (including physical abuse, other abuse allegations, supervised visitation with her own children until the family court awarded her joint custody of the children but not physical custody of her older child);[10] Grandfather's schizophrenia; and the "minimum standards" of the home (the number of occupants, the clutter, and the lack of "a whole lot of room for [Aaron and C.A.] to move as far as ... their development").[11]

2. Further Evidence, Argument, Orders, and Findings

During the children's attorney's cross-examination of Sledge, the Agency's counsel objected to the question whether Sledge believed that the children could be safe in Grandmother's home. The Agency's counsel argued that "once a waiver isn't given by a chief, the court is aware it doesn't matter what the social worker thinks." The court responded, "Is it your position that I can't override the waiver? Because if so, then there's no need for this trial." The Agency's counsel then said, "The case out of L.A. County[[12]]  it does say you are not supposed to put kids in unlicensed homes." The court replied, "I think what I am asking you if it is your position that the chief says something, [the court] can't do anything. I need to know that. If Ms. Johnson is in charge of the case, and that the court has no jurisdiction, that is fine, if that's your legal position." The Agency's counsel asserted, "[I]f the home is totally unlicenseable, can a court put the children in there? And our position is no, they cannot." The court overruled the objection, stating, "The question that the court has to look at is whether or not the previous disposition was ineffective. And unless it is, per se, answered, because a chief will not grant a waiver, then we have to go on with the trial."
Near the end of the June 10, 2003 proceedings, the Agency's counsel again cited L.A. County I. The court and the children's attorney said they would have to review that case. The court ordered that all appropriate relatives be evaluated and gave the social worker discretion to detain the children with an appropriate relative, with 48 hours' notice to all counsel. It continued the matter to June 17.
On June 17, 2003, the petitions were amended to allege that "the previous disposition has not been effective in the protection or rehabilitation of the child"; and Grandparents were no longer able to provide adequate care and supervision because "the home [was] no longer approved by [the Agency] for placement of the child."[13] The allegations concerning Grandmother's statement that Grandfather suffered from a mental illness and of discovery of a CPS neglect and abuse history *540 were stricken. The court accepted a stipulation that Agency Chief Heidi Staples would testify that the home was not approved and she would not give a waiver. Mother submitted on the petition on the basis of the social worker's reports.
The court entered true findings on the petitions.[14] It stated, "This case is a stinker," then placed the children in a licensed foster home and detained them, pending placement, in Polinsky Children's Center, a licensed foster home, or adjunct, and ordered reasonable unsupervised visitation for Grandmother on the condition she not leave the children alone in Grandfather' care.
The court said, "The evidence as it stood when we ended the trial was the social worker testifying, essentially, it would be detrimental to remove these children. [¶] I don't care what anybody says. The court views this case as we supported this. [Grandfather] was schizophrenic for two years and nobody seemed to be that concerned about it. But I know what it is. [¶] It is going to interfere with an adoption, and I guess we have to consider that because the most permanent plan is appropriate. But, you know, I mentioned this earlier, I think sometimes we really get hung up on protocols. [¶] And you know it's sad for these kids. I mean, nine people in the home. There has been nine people in the home, C.P.S. history. There was a C.P.S. history. It didn't seem to bother anybody until it got on the verge of an adoption. And it is very sad for these kids. I think they are going to suffer because of that." The court also noted "the children [are] going to be in a lot of pain" and it commented, "I still don't quite understand what went on here."

IV.

POSTREMOVAL EVENTS
After the removal, Grandmother continued to have visits and telephone contact with Miguel and visits with Aaron and C.A.[15] The removal was very hard on all three children. Miguel's therapist said that Miguel had been "somewhat traumatized" by the removal and had displayed "a moderate symptom upswing consisting primarily of nightmares, but also including some mild aggressive acting out at school." The therapist "agreed that Miguel identified strongly with his relationship with [Grandmother.]" Miguel himself told the social worker that he loved Grandmother, felt safe in her home, and wanted to live with her. While Aaron eventually appeared to stabilize in his foster placement, he showed "some aggressive and tantruming behaviors," delays in fine motor skills, and speech and language delays. He cried when separated from Grandmother, from Mother, and from his foster mother. His "verbal attempts" were understandable only by his family. Miguel said "he would be sad not to live with" Aaron. In spite of the significant sibling relationships among the three children, the Agency concluded that there was no reasonable alternative to different permanent plans.
In its assessment filed for Miguel's and Aaron's section 366.26 hearing, the Agency recommended permanent plans of another planned permanent living arrangement for Miguel, so the Agency could "focus on uniting" him with his father, who lived in *541 Florida, had not responded to the social worker's offer of information about the permanency planning assessment, and had not followed through with previous agreements to visit and contact Miguel. On June 3, 2003, Miguel told the social worker that he had had telephone contact with his father and with a paternal aunt.[16] He was happy about that contact and, according to his school social worker, very happy with his new foster mother, apparently wondering out loud if she "could be his new mother." On June 27, Miguel's father came to San Diego for a week of visitation. When the social worker asked him where he would like to live, understanding that he was not allowed to live with Mother or Grandmother, he also said he wanted to live with a maternal aunt and with his father.
For Aaron, the Agency's assessment recommended a permanent plan of adoption. The assessment estimated that 72 homes would be available for him, 30 of which would also accept C.A. if her case were in the permanency planning phase. Following the removal, C.A. was placed in two successive foster homes, but not with Aaron. The Agency matched Aaron and C.A. with a concurrent planning foster home and Aaron began visits with the family, but this placement did not work out and the two children were not moved from their foster homes.
On July 22, 2003, Miguel's attorney filed a section 388 modification petition, asking "that the petition[[17]] be dismissed pursuant to ... section 390" or that Miguel be placed with Grandparents, who were entitled to custody pursuant to a family court order.[18] On July 22, the court denied the section 388 petition without prejudice, ordered a permanent plan of "another planned permanent living arrangement" for Miguel, and placed him with his paternal aunt and uncle.[19]

V.

DISCUSSION

A. Miguel's Notice of Appeal
On September 25, 2003, the Agency filed a motion requesting that Miguel's appeal be dismissed because his notice of appeal was filed late, on August 27. Miguel filed a petition for writ of habeas corpus, seeking relief from the purportedly untimely filing. Both the Agency and Miguel also discuss the issue in their briefs. Mother and Grandparents join in Miguel's petition.
In the writ proceedings, both Miguel's counsel and the Agency assume, without explanation, that the notice of appeal was due on August 26, 2003. The Agency's motion to dismiss explains why it believes the appeal is late, and Miguel's opposition concedes the point.
In its motion, the Agency argues that pursuant to California Rules of Court,[20] *542 rule 39(b), the notice of appeal had to be filed 60 days after the order became final under rule 1417(c); the referee's order did not have to be served on Miguel and he was represented by counsel who was present when the order was pronounced; therefore, the order became final 10 days after it was pronounced; thus, the notice of appeal was due 70 days after June 17, 2003. The statutes the Agency cites are not on point and the cases it cites did not involve referees. (In re Markaus V. (1989) 211 Cal.App.3d 1331, 1335, 260 Cal.Rptr. 126; Mauro B. v. Superior Court (1991) 230 Cal.App.3d 949, 956, 281 Cal.Rptr. 507; In re Alyssa H. (1994) 22 Cal.App.4th 1249, 1253, 27 Cal.Rptr.2d 809.) The Agency does not mention rule 1416(b)(3).
Generally, in a juvenile dependency case heard by a judge, a notice of appeal must be filed no later than 60 days after the judgment is rendered or the order is made. (Rules 39(b), 39.1(f).) With exceptions not applicable here, when the matter is heard by a referee, the notice of appeal must be filed "within 60 days after the order ... becomes final under rule 1417(c)." (Rules 39(b), 39.1(f); see also § 395.) Rule 1417(c), also with exceptions not applicable here, states that a referee's order "shall become final 10 calendar days after service of a copy of the order and findings under rule 1416." Rule 1416(b)(3) requires that "a copy of the findings and order, with a written explanation of the right to seek review of the order by a juvenile court judge," be served by mail on the child's counsel, with service deemed complete at the time of mailing.
Here, the June 17, 2003 minute order was served by mail on Miguel's counsel on June 20. The referee's order therefore became final on June 30, "10 calendar days after service of a copy of the order and findings under rule 1416." (Rule 1417(c).) Thus, the notice of appeal was due 60 days after June 30, that is, on August 29. Because the notice of appeal was filed in a timely manner on August 27, we deny the petition as moot and deny the motion to dismiss Miguel's appeal.

B. Grandparents' Appeal
The Agency's September 25, 2003 motion also requests that Grandparents' appeal of the section 387 order be dismissed for lack of standing. Grandparents oppose the motion. The parties also address the issue in their briefs.
In section 300 proceedings, the Agency, the child, and the parent or guardian have the right to appeal. (Rule 1435(a).) Additionally, "[u]pon a sufficient showing the [juvenile] court may recognize the child's present or previous custodians as de facto parents and grant standing to participate as parties in disposition hearings and any hearing thereafter at which the status of the dependent child is at issue. The de facto parent may: [¶] (1) Be present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the court, by appointed counsel; [¶] (3) Present evidence." (Rule 1412(e).) The rights of relatives other than parents are delimited as follows: "Upon a sufficient showing the [juvenile] court may permit the relatives of the child to: [¶] (1) Be present at the hearing; [¶] (2) Address the court." (Rule 1412(f).)
Grandparents were present in court for the June 2, 2003 detention hearing on the section 387 petition and Grandmother was present for the June 17 hearing. They did not ask to address the court. At the time of the June 17 hearing, Grandparents had not applied for or *543 achieved de facto parent status.[21] Thus, they were merely relatives, not parties. "[O]nly parties of record may appeal. [Citation.] A party of record is a person named as a party to the proceedings or one who takes appropriate steps to become a party of record in the proceedings." (In re Joseph G. (2000) 83 Cal.App.4th 712, 715, 99 Cal.Rptr.2d 915 [alleged biological father had not become a party and lacked standing].) If Grandparents had sought de facto parent status in a timely manner, and had been granted that status, they would have standing to appeal. (Christina K. v. Superior Court (1986) 184 Cal.App.3d 1463, 1469, 229 Cal.Rptr. 564 [juvenile court erred by summarily denying foster parent's request to participate in the proceedings].) They did not do so.
Grandparents assert that they have standing as relatives (citing Charles S. v. Superior Court (1985) 168 Cal.App.3d 151, 157, 214 Cal.Rptr. 47) and as de facto parents who had not yet been officially granted that status (citing Katzoff v. Superior Court (1976) 54 Cal.App.3d 1079, 1083-1085, 127 Cal.Rptr. 178; In re B.G. (1974) 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244; and In re Joel H. (1993) 19 Cal.App.4th 1185, 1193-1195, 23 Cal.Rptr.2d 878). Not so. Unlike the situations in Charles S. v. Superior Court, supra, 168 Cal.App.3d at pp. 156-157, 214 Cal.Rptr. 47; Katzoff v. Superior Court, supra, 54 Cal.App.3d at pp. 1082-1083, 127 Cal.Rptr. 178; and In re B.G., supra, 11 Cal.3d at pp. 683, 686, 692, 114 Cal.Rptr. 444, 523 P.2d 244, Grandparents did not seek to participate in the proceedings below. Unlike the situation in In re Joel H., supra, 19 Cal.App.4th at page 1193, 23 Cal.Rptr.2d 878, the de facto issue was disputed and Grandparents were not described as de facto parents in the juvenile court. "California's doctrine of de facto parent status is a judicially created doctrine, but one which is now spelled out in the California Rules of Court." (In re Brandon M. (1997) 54 Cal.App.4th 1387, 1393, 63 Cal.Rptr.2d 671.) De facto parent status is a factual matter for the juvenile court to decide; the applicant bears the burden of proof. (In re Michael R. (1998) 67 Cal.App.4th 150, 155, 78 Cal.Rptr.2d 842; see also Katzoff v. Superior Court, supra, 54 Cal.App.3d at p. 1085, 127 Cal.Rptr. 178; rule 1412(e).) Grandparents do not have standing to appeal as de facto parents or as relatives.
Grandparents argue that they were not served with the petitions, properly noticed of the hearing, or informed of their rights, including the rights to counsel, to seek de facto parent status, to request that the court subpoena witnesses and order production of documents, and to address the court, depriving them of their statutory and due process rights. Grandparents cite In re Jonique W. (1994) 26 Cal.App.4th 685, 31 Cal.Rptr.2d 601. In that case, however, the grandmother had sought and received de facto parent status. (Id. at pp. 689, 693, 31 Cal.Rptr.2d 601.) Thus, In re Jonique W. is distinguishable. Furthermore, although Grandparents appeared at the detention hearing on the section 387 petition and Grandmother was present on June 17, they did not make any of these arguments below. While they should have been served with the petition and notice of hearing (rules 1407(d) & (e)(4)(C), 1431(b)), they waived any right to challenge the lack of notice by failing to do so in the juvenile court. (In re B.G., supra, 11 Cal.3d at p. 689, 114 Cal.Rptr. 444, *544 523 P.2d 244.) We grant the Agency's motion to dismiss Grandparents' appeal.

C. The Section 387 Proceedings
Mother and Miguel contend the court erred by removing the three children from Grandparents' home. Mother asserts the true findings on the section 387 petitions and the removal order are unsupported by substantial evidence; Grandmother's CPS history and Grandfather's illness created, at most, a presumption of risk, which was rebutted; the Agency tacitly approved the conditions in Grandparents' home it later classified as risks; its change of position does not amount to substantial evidence that the placement was ineffective in protecting the children; and the court erred by failing to bifurcate the proceedings. Miguel asserts the Agency's refusal to approve the home did not compel removal; the juvenile court abdicated its duty to make an independent judgment of the appropriateness of the placement; even if the court had considered Grandparents' histories and the condition of their home as a basis for its findings and orders, those factors did not constitute substantial evidence; and the removal violated the children's fundamental rights to remain placed with their biological family.
The gist of the Agency's position on the merits is that the juvenile court is barred from reviewing the Agency's executive decision not to approve a relative placement and not to grant an exemption from placement criteria. The Agency misses the point. Its executive role in determining whether or not to approve a relative placement and whether or not to grant an exemption is not at issue here. There was no criminal conviction to be exempted. The Agency had already approved the placement; although in doing so it apparently did not examine its own records, it was plainly on notice of the alleged deficiencies it later asserted. What is at issue is whether the Agency may usurp the juvenile court's judicial power under section 387 to determine the propriety of a child's removal from a relative placement, and whether the Agency has an unfettered right to change that placement no matter how the change affects the children. The answer to these questions is no. (Cf. Cesar V. v. Superior Court (2001) 91 Cal.App.4th 1023, 1033, 111 Cal.Rptr.2d 243 [the juvenile court must exercise its independent judgment regarding a section 361.3 relative placement request, not merely review the social service agency's decision for an abuse of discretion].) For the reasons we discuss below, we determine the Agency does not have the absolute authority to change a relative placement already ordered by the court and that the Agency's withdrawal of its approval of Grandparents' home did not relieve the juvenile court of its duty to review the appropriateness of that placement. We further determine that the record lacks substantial evidence supporting the removal order.
A supplemental petition "shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3." (§ 387, subd. (a).) The last clause relating to relative placement was added to section 387 in 1997. (Added by Stats.1997, ch. 793.)
Section 361.3, subdivision (a), lists criteria for relative placement to be considered by the social worker and the court, including, but not limited to, the child's best interest (§ 361.3, subd. (a)(1)); the wishes of the parent, relative, and child (§ 361.3, *545 subd. (a)(2)); the provisions of Division 12, Part 6 of the Family Code (including Fam.Code, § 7950 [preference for placement with relative and prohibited discrimination]) (§ 361.3, subd. (a)(3)); placement of siblings in the same home, if in the children's best interests (§ 361.3, subd. (a)(4)); "[t]he good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect" (§ 361.3, subd. (a)(5)); the nature and duration of the child-relative relationship and the relative's desire to care for the child and provide permanency (§ 361.3, subd. (a)(6)); the relative's ability to provide a safe, secure, and stable environment, a home, necessities of life, and legal permanence; exercise proper and effective care and control; protect the child from the parents; facilitate reunification, relative visitation, and implementation of the case plan; and arrange for appropriate and safe child care (§ 361.3, subd. (a)(7)); and the safety of the home (§ 361.3, subd. (a)(8)).
Section 361.3, subdivision (a)(8) also states, "For a relative to be considered appropriate to receive placement of a child under this section, the relative's home shall first be approved pursuant to the process and standards described in subdivision (d) of Section 309." Section 309, subdivision (d) concerns the Agency's assessment and approval of a relative's home for "temporary placement of the child pending the detention hearing." (§ 309, subd. (d)(1).) The assessment involves an in-home inspection regarding safety and the relative's ability to care for the child, and, for adult household members, checks for criminal records and prior allegations of child abuse or neglect. (Ibid.) The approval is to be based on the "standards set forth in regulations for the licensing foster family homes which prescribe standards of safety and sanitation for the physical plant and standards for basic personal care, supervision, and services provided by the caregiver." (§ 309, subd. (d)(2).) If the home meets all conditions except receipt of Federal Bureau of Investigation criminal history information, the Agency may nevertheless approve the home if it obtains signed statements from the adult household members that they have no convictions other than traffic infractions. The Agency may terminate its approval if it later determines an adult household member has a criminal record. (§ 309, subd. (d)(3).)
The hearing on the section 387 petition is conducted by first following the procedures for jurisdictional hearings and making a finding that the factual allegations and the allegation of an ineffective prior disposition are or are not true; if there is a true finding, the court then follows the procedures for dispositional hearings to determine whether removal is appropriate. (Rule 1431(d).)
We reject Mother's assertion the juvenile court erred by failing to bifurcate the proceedings. She failed to raise this objection below and has therefore waived the right to do so. (In re Richard K. (1994) 25 Cal.App.4th 580, 590, 30 Cal.Rptr.2d 575.) Even if she had not waived her right to raise the issue, she has not shown prejudice, or even asserted it. She cites In re Fred J. (1979) 89 Cal.App.3d 168, 178, 152 Cal.Rptr. 327, for the proposition that a failure to bifurcate requires reversal. We disagree with that case. "When a [rule] does not provide any consequence for noncompliance, the language should be considered directory rather than mandatory. [Citations.] The directory and mandatory designations do not refer to whether a particular ... requirement is *546 permissive or obligatory, but simply denote whether the failure to comply with a particular procedural step will invalidate the governmental action to which the procedural requirement relates." (In re C.T. (2002) 100 Cal.App.4th 101, 111, 121 Cal.Rptr.2d 897.) Here, the rule provides no penalty if the court does not comply with it, making the language directory.
The Agency claims that the appellants have waived the right to assert that the juvenile court had the authority to review the Agency's rescission of its approval of Grandparents' home. The Agency contends that at the June 10, 2003 hearing, after its trial counsel cited L.A. County I, and at the June 17 hearing, when the petitions were amended, no one argued that the court could override the Agency's decision, the amended petitions failed to state causes of action, or the court should order that the children remain in Grandparents' home.
We reject the Agency's claim. First, its trial counsel cited L.A. County I as part of an objection to a question by the children's attorney during his cross-examination of the social worker (whether she believed the children could be safe in Grandmother's home). The children's counsel expressed his disagreement with the Agency's position that the court "could not put the children in" a "totally unlicenseable" home and the court overruled the Agency's objection. Second, although Mother's counsel said she had no objection to the amendment of the petitions, this is not the same as saying that the petitions stated a cause of action. While Mother submitted on the social worker's reports, this does not operate as a waiver of her right to contend that the court's decision was unsupported by substantial evidence. (In re Richard K., supra, 25 Cal.App.4th at pp. 589-590, 30 Cal.Rptr.2d 575.) "Notwithstanding a submittal on a particular record, the court must nevertheless weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been proved. [Citation.] In other words, the parent acquiesces as to the state of the evidence yet preserves the right to challenge it as insufficient to support a particular legal conclusion." (Id. at p. 589, 30 Cal.Rptr.2d 575.) Finally, questions of law, such as whether the Agency's refusal to approve the home compelled removal, are subject to de novo review. (See In re Steven H. (2001) 86 Cal.App.4th 1023, 1032, 103 Cal.Rptr.2d 649.)
In support of its position that the court lacked the power to review the Agency's retraction of its approval of Grandparents' home, the Agency relies on L.A. County I. There, after a dependency petition was filed, the children were detained and the juvenile court ordered the Los Angeles County Department of Children and Family Services (DCFS) to investigate the home of the children's great-uncle and his wife for possible placement. (L.A. County I, supra, 87 Cal.App.4th at p. 1163, 105 Cal.Rptr.2d 254.) The investigation revealed that the great-uncle had a criminal record, apparently including 16 drug-related convictions and jail and prison sentences. (Id. at pp. 1163-1164, 105 Cal.Rptr.2d 254.) Because of his criminal record, drug use history, and poor health, DCFS recommended against placement. (Id. at p. 1164, 105 Cal.Rptr.2d 254.)
The juvenile court ordered the children released to the wife and allowed the great-uncle monitored contact. (L.A. County I, supra, 87 Cal.App.4th at p. 1164, 105 Cal.Rptr.2d 254.) DCFS applied for a rehearing, citing section 361.4, subdivision *547 (d)(2),[22] but the court ordered that the children remain released to the wife. (L.A. County I, supra, at p. 1164, 105 Cal.Rptr.2d 254.) After the Court of Appeal issued a Palma notice (Palma v. U.S. Industrial Fasteners, Inc. (1984) 36 Cal.3d 171, 180, 203 Cal.Rptr. 626, 681 P.2d 893) directing the court to change the placement order, the juvenile court noted that the wife was caring for the children appropriately, ordered the great-uncle to move out of her home, and ordered DCFS to verify that he had moved out. (L.A. County I, supra, 87 Cal.App.4th at pp. 1164-1165, 105 Cal.Rptr.2d 254.) DCFS verified this, but then a social worker paid a surprise visit to the home and found the great-uncle there. (Id. at p. 1165, 105 Cal.Rptr.2d 254.) After the Court of Appeal issued an alternative writ directing the juvenile court to remove the children from the wife's home or bar contact between the children and the great-uncle, DCFS informed the reviewing court that the juvenile court had granted the wife guardianship over DCFS's objection. (Ibid.)
The Court of Appeal directed the juvenile court to vacate its orders placing the children in a home in which the great-uncle resided or which afforded him significant contact with the children, enter a new order removing them from the wife's home and placing them in a suitable home, and vacate its guardianship order. (L.A. County I, supra, 87 Cal.App.4th at p. 1171, 105 Cal.Rptr.2d 254.) The reviewing court noted that the language of section 361.4, subdivision (d)(2), "the child shall not be placed in the home," was mandatory, "applied broadly to anyone involved in placement," and did "not confer on the juvenile court any discretion to avoid its prohibition." (L.A. County I, supra, 87 Cal.App.4th at p. 1166, 105 Cal.Rptr.2d 254.) The court observed that the provision in section 361.4, subdivision (d)(3) regarding a waiver of the disqualification did not allow the juvenile court to grant a waiver, but rather allowed only DCFS to *548 request one from the Director of the Department of Social Services (DSS), and only DSS to grant or deny the request. (L.A. County I, supra, 87 Cal.App.4th at pp. 1166-1168, 105 Cal.Rptr.2d 254.)
L.A. County I is not on point. That case concerned placement in the first instance, not removal from an existing placement DCFS had already approved. Additionally, L.A. County I concerned the mandatory statutory language regarding criminal convictions, inapplicable in this case.
In L.A. County II, the reviewing court confirmed that section 361.4 referred only to placements, not removals. (L.A. County II, supra, 112 Cal.App.4th at pp. 519-521, 5 Cal.Rptr.3d 182.) In that case, three sisters were removed from their parents at birth in 1992, 1994, and 1997. They were detained and then placed with their aunt. (Id. at p. 513, 5 Cal.Rptr.3d 182.) In 1998, the aunt received probation after pleading guilty to felony infliction of corporal injury on her son (Pen.Code, § 273d). The girls were removed from the aunt's care pursuant to a section 387 petition. (L.A. County II, supra, 112 Cal.App.4th at pp. 513-514, 5 Cal.Rptr.3d 182.) In May 1999, the court ordered the two younger girls returned. DCFS had recommended against the return on the ground that the aunt's recent physical abuse of her son, recent marriage, and recent return of her own children created too many stressors, but it did not argue section 361.4 and did not seek review of the order. (L.A. County II, supra, 112 Cal.App.4th at p. 514, 5 Cal.Rptr.3d 182.) In October 1999, the court ordered the oldest girl be returned. DCFS had recommended against the return because it would have been a violation of its policy to recommend placement in light of the aunt's criminal record of child endangerment. DCFS did not seek review of this order. The court ordered a permanent plan of long-term foster care. (Ibid.)
In November 2002, the aunt was arrested for inappropriate physical discipline of her daughter. She was convicted of misdemeanor disorderly conduct and placed on probation. In February 2003, DCFS filed a section 387 petition alleging the previous disposition had been ineffective in protecting the children. It requested that the children be detained, arguing that section 361.4 required the court to do so in light of the aunt's Penal Code section 273d conviction. (L.A. County II, supra, 112 Cal.App.4th at p. 514, 5 Cal.Rptr.3d 182.) The court denied the request, noting that section 361.4 concerned placement, not removal; neither the convictions nor DCFS's other evidence established a factual basis for removal; and removal would be extremely detrimental to the girls. (L.A. County II, supra, at pp. 514-515, 5 Cal.Rptr.3d 182.) After the detention hearing, the aunt's Penal Code section 273d conviction was expunged. (L.A. County II, supra, at p. 518, 5 Cal.Rptr.3d 182.)
DCFS filed a petition for writ of mandate, contending the court had no discretion to deny its detention request because the aunt's Penal Code section 273d conviction made her home ineligible for placement under section 361.4. (L.A. County II, supra, 112 Cal.App.4th at p. 516, 5 Cal.Rptr.3d 182.) The Court of Appeal denied the petition (Id. at pp. 516, 521, 5 Cal.Rptr.3d 182.) It held that despite the expungement, the aunt's conviction "continue[d] to operate as a nonexemptible disqualifying criminal offense under Health and Safety Code section 1522, subdivision (g)," whose definition of such offenses and standards for granting exemptions are incorporated into section 361.4, subdivision (d). (L.A. County II, supra, 112 Cal.App.4th at pp. 519-520, 5 Cal.Rptr.3d 182.) Nevertheless, the dependency court had *549 discretion to allow the children to remain in the aunt's home because section 361.4 "refers only to placements" and "does not apply when the issue is whether a child is to be removed from an existing placement if a criminal records check reveals a conviction occurring after the placement." (Id. at pp. 519-521, 5 Cal.Rptr.3d 182, italics added.)
The Agency properly notes that L.A. County II is distinguishable to the extent it deals with criminal convictions under section 361.4. We disagree with the Agency, however, in its criticism of L.A. County II for purportedly ignoring sections 387, 361.3, and 309 and for failing to recognize the executive authority of DCFS to approve relative homes and decide exemptions. The procedural status of that case was consideration of DCFS's request under section 361.4 to detain the children out of the relative's home, where they had been placed, pending a hearing on its section 387 petition. (L.A. County II, supra, 112 Cal.App.4th at pp. 514-516, 5 Cal.Rptr.3d 182.) No discussion of section 387, 361.3, or 309 was necessary. The Agency also asserts that the L.A. County II court failed to recognize the termination of approval provision in section 309, subdivision (d). Even if section 309 had been applicable, however, there is no indication that the prerequisites in subdivision (d) for termination of approval had been met (approval based on signed statements that there were no convictions, followed by discovery of a criminal record).
The Agency also discusses In re Jullian B. (2000) 82 Cal.App.4th 1337, 99 Cal.Rptr.2d 241 to illustrate its executive function regarding exemptions. That case is not on point. It concerned the social service agency's failure to approve the home of an Indian relative who had criminal convictions; the child had not yet been placed in the home. (Id. at pp. 1342-1344, 99 Cal.Rptr.2d 241.)
As mentioned above, before the court made its true findings, the supplemental petitions were amended by replacing allegations that Grandmother said that Grandfather had a mental illness, and the Agency had discovered a CPS neglect and abuse history, with an allegation that Grandparents' home was "no longer approved by [the Agency] for placement." Thus, the court's findings and orders were based solely on the Agency's withdrawal of its approval of Grandparents' home. Clearly, the record supports the conclusion that the factual allegation of the petitions was true; the Agency did, indeed, withdraw its approval of the home.
Even though we review the record in the light most favorable to the order (In re Joel H., supra, 19 Cal.App.4th at p. 1199, 23 Cal.Rptr.2d 878),[23] the Agency's withdrawal of its approval does not constitute *550 substantial evidence that the previous disposition was not effective or that the placement was not appropriate under the criteria in section 361.3. Whether the Agency approved Grandparents' home (§ 361.3, subd. (a)(8)) was just one of the factors in section 361.3 the court could have considered. The evidence, summarized above, showed that the children had been flourishing in Grandparents' home for about two years (Miguel and Aaron) and about one year (C.A.). When Miguel's and Aaron's cases reached the permanency planning stage, the Agency suddenly changed its mind about the placement.
There is no evidence in the record that Grandmother's approximately 13-year-old CPS history consisted of anything but allegations. Although the Agency was aware of this history  a part of its own records  all along, its reports do not clearly state what the history was. What, precisely, were the allegations? Were any allegations substantiated? If so, which ones?
Similarly, the Agency had been aware of Grandfather's diagnosis for almost a year. There is no indication in the record that his schizophrenia had any adverse consequences. He was stable and on medication. The only negative comments about him were the social worker's statements in the June 2003 section 387 detention report that "he is unable to fulfill the requirements of employment" and "[h]e has been observed to be socially withdrawn and have poor affect." The report does not say who did the observing, nor is there any indication how Grandfather's inability to be employed might present a problem. The Agency also remarks on Grandfather's refusal to sign a release of his mental health information after consulting with Grandmother, but fails to explain why this should lead to an adverse inference. If the Agency wanted further information about Grandfather, why did it not request it before approving the children's placement in the home? In any event, although Grandmother may have initially failed to follow the Agency's directive not to leave the children alone with Grandfather, she may later have had her own older children help care for the dependent children, and by May 29, she was providing the children's primary care.[24]
While the detention report noted that the home was cluttered and of marginal cleanliness and two of Grandmother's daughters had moved in, Grandmother planned improvements and the social worker was not concerned about the home's standards. There was no evidence that Grandparents' home was other than a "secure and stable environment" or that it presented any danger to the children. (In re Joel H., supra, 19 Cal.App.4th at pp. 1201, 1203, 23 Cal.Rptr.2d 878.) The juvenile court's comments, supported by the evidence, illustrate that moving from Grandparents' home was going to be difficult for the children, to say the least. The court's comments also show that it believed it was compelled to rule the way it did although it was not in the children's best interests. It was not so compelled. While it depends on the Agency's expertise for guidance (In re Robert A. (1992) 4 Cal.App.4th 174, 189, 5 Cal.Rptr.2d 438), it must exercise its own discretion.
Because there was no substantial evidence that the previous disposition was *551 ineffective or that the placement was not appropriate under the criteria in section 361.3, the juvenile court erred by ordering the children removed from Grandparents' home. In light of our conclusion, we need not discuss Miguel's contention that the removal violated the children's fundamental rights to remain placed with their biological family.[25]

D. ICWA
Mother contends that the section 387 decision to place Aaron in foster care must be reversed because the required ICWA notice was not given to the tribes or the Bureau of Indian Affairs (BIA). We agree.
"[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).) "If the identity or location of the ... tribe cannot be determined, such notice must be given to" the BIA. (Ibid.; Dwayne P. v. Superior Court (2002) 103 Cal.App.4th 247, 126 Cal.Rptr.2d 639.)
"`Since failure to give proper notice of a dependency proceeding to a tribe with which the dependent child may be affiliated forecloses participation by the tribe, notice requirements are strictly construed.'" (In re Karla C. (2003) 113 Cal.App.4th 166, 174, 6 Cal.Rptr.3d 205, quoting In re Samuel P. (2002) 99 Cal.App.4th 1259, 1267, 121 Cal.Rptr.2d 820.) The notice requirement applies even if the Indian status of the child is uncertain. (In re Kahlen W. (1991) 233 Cal.App.3d 1414, 1422, 285 Cal.Rptr. 507.) The showing required to trigger the statutory notice provisions is minimal; it is less than the showing needed to establish a child is an Indian child within the meaning of ICWA. (Dwayne P. v. Superior Court, supra, 103 Cal.App.4th at p. 258, 126 Cal.Rptr.2d 639.) A hint may suffice for this minimal showing. (Ibid.) "The determination of a child's Indian status is up to the tribe; therefore, the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement." (In re Nikki R. (2003) 106 Cal.App.4th 844, 848, 131 Cal.Rptr.2d 256.) "If ... the court has reason to know the child may be an Indian child, the court shall proceed as if the child is an Indian child...." (Rule 1439(e).) "If at any time after the filing of the petition the court knows or has reason to know that the child is or may be an Indian child, the ... notice procedures must be followed." (Rule 1439(f).)
"`[P]arents are not necessarily knowledgeable about tribal government or membership and their interests may diverge from those of the tribe and those of each other. [Citation.]'" (Dwayne P. v. Superior Court, supra, 103 Cal.App.4th at p. 257, 126 Cal.Rptr.2d 639, quoting In re Kahlen W., supra, 233 Cal.App.3d at p. 1425, 285 Cal.Rptr. 507.) "We agree that `[t]o maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child. [Citation.]'" (Dwayne P. v. Superior Court, supra, 103 Cal.App.4th at p. 257, 126 Cal.Rptr.2d 639, *552 quoting In re M.C.P. (1989) 153 Vt. 275, 571 A.2d 627, 634-635.)
Mother's July 2001 paternity questionnaire said that Aaron's father, Edward G., had American Indian heritage through an Apache tribe. Although the detention report stated that ICWA "does or may apply," at the detention hearing that month the court found it did not apply. Edward's May 2002 paternity questionnaire said that he "maybe" had American Indian heritage through an Apache tribe. On May 6, the court set a hearing on ICWA issues for May 21. On May 16, the Agency filled out notice forms for the Mescalero Apache Tribal Council, the Ikce Oyate Nation, and the BIA. The Agency's May 21 report says that the notices to the Mescalero Apache Tribal Council and the Ikce Oyate Nation were by certified mail. On May 21, the court found that ICWA did not apply. The parties apparently assumed that because Edward associated with a tribe that was not registered, and he had not yet enrolled in a registered Apache tribe, ICWA was inapplicable. While the notice forms are difficult to read, it appears that Aaron's biological grandfather was affiliated with an Apache tribe.
There are several ICWA notice problems here. First, the Ikce Oyate Nation does not appear to be a federally recognized Indian entity and there were and are other Apache tribes in addition to the Mescalero Apache. (65 Fed.Reg. 13298 (Mar. 13, 2000); 69 Fed.Reg. 68180 (Dec. 5, 2003).) Second, there is no indication that the notice to the BIA was ever sent, nor is there any indication the notices were sent by registered mail with return receipt requested. (In re Karla C., supra, 113 Cal.App.4th at pp. 174-176, 6 Cal.Rptr.3d 205.) Third, the notices did not contain much of the required information. (Id. at p. 175, 6 Cal.Rptr.3d 205.) We remand for compliance with ICWA.

E. The Agency's Dismissal Motions
On March 2, 2004, the Agency filed a motion to dismiss Miguel's, Grandparents', and Mother's appeals as to C.A. As part of this motion, the Agency requests judicial notice of a February 20, 2004 order placing C.A. with her father and setting a review hearing for August 18. The Agency contends this placement makes the issue of her continued placement with or removal from Grandparents moot. Mother, the three children, and Grandparents filed opposition to the motion. We grant the request for judicial notice.
On February 20, 2004, the juvenile court did not terminate jurisdiction. If the June 2003 order is left undisturbed, Grandparents' home will not be a placement option for C.A. in the event her placement with her father fails. Even if that placement succeeds, leaving the June 2003 order intact may limit her ability to have full visitation with Grandparents. We therefore deny this dismissal motion.

DISPOSITION
Miguel's petition for writ of habeas corpus is denied. Grandparents' appeal is dismissed. The June 10 and 17, 2003 findings and orders on the section 387 petitions are reversed. This matter is remanded to the juvenile court, with the following directions.
As to Aaron, the court shall (1) require the Agency to give proper ICWA notice to and file with the court the notices, return receipts, and any responses; and (2) hold a new section 387 hearing. If, at the new hearing, the court determines the ICWA notice was proper and no Indian entity seeks to intervene or otherwise indicates Aaron is an Indian child as defined by ICWA, the court shall proceed with the section 387 hearing and exercise its discretion *553 as outlined in this opinion. If, on the other hand, an Indian entity determines Aaron is an Indian child under ICWA, the court shall proceed in accordance with ICWA.
As to Miguel and C.A., the court shall hold a new section 387 hearing at which it shall exercise its discretion as outlined in this opinion.
WE CONCUR: McCONNELL, P.J., and AARON, J.
NOTES
[*] George, C.J., did not participate therein.
[1] Aaron and C.A. do not appeal but, according to the children's appellate counsel, support Miguel's position.
[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[3] An earlier psychological evaluation had also revealed depression and attachment issues.
[4] This information about the May 4 visit was reported in the assessment the Agency prepared for Miguel's and Aaron's section 366.26 hearing.
[5] This report was written by adoptions unit social worker Jamie Rivas and her supervisor Sue Chamberlin.
[6] Grandmother's four biological children living in the home were ages 12 to 16. These four children slept "in a converted side area in the home."
[7] Grandmother had undergone a psychological evaluation in 1989.
[8] When C.A. was born that month, the home had to be reapproved.
[9] According to Miguel's and Aaron's June assessment, during a May 4 visit by the social worker, the older children in the home helped care for Aaron and C.A.
[10] Sledge's testimony that these were the specifics of Grandmother's CPS history was admitted only as a basis for her opinion.
[11] When asked how the standards of the home had changed over the past year, Sledge testified that Grandmother's two other daughters had moved in.
[12] Los Angeles County Dept. of Children & Fam. Services v. Superior Court (Valerie A.) (2001) 87 Cal.App.4th 1161, 105 Cal.Rptr.2d 254. We refer to this case as "L.A. County I" and to a later case, Los Angeles County Dept. of Children & Fam. Services v. Superior Court (Cheryl M.) (2003) 112 Cal.App.4th 509, 5 Cal.Rptr.3d 182, as "L.A. County II."
[13] These amendments, the Agency's detention report on the section 387 petitions, and other parts of the record refer to the children's placement with Grandparents. The original section 387 petitions and some portions of the record refer to placement with Grandmother only.
[14] After the court made the true findings, the children's attorney said he had a letter from Grandfather's psychiatrist stating that Grandfather posed no threat and his diagnosis was schizophrenia, paranoid type, in remission with medication; the psychiatrist had been ready to testify at the hearing that day.
[15] During Grandmother's visits, C.A. had contact with Miguel and Aaron.
[16] The assessment says "parental." We assume this is a typographical error.
[17] This is apparently a reference to the section 387 petition.
[18] The modification petition does not further identify the family court order.
[19] In her reply brief, the children's counsel objects to the Agency's references to the children's changing placements. She requests that all of its references to post-appeal matters be stricken, or, alternatively, that we also consider her updated information. As discussed below, we take judicial notice of a February 20, 2004 order placing C.A. with her father. We note that Aaron has been returned to Grandmother's care, but do not consider that in reaching our decision in this appeal and decline to consider any further information outside of the record.
[20] Rule references are to the California Rules of Court.
[21] On July 10, Grandparents filed a de facto parent application. The juvenile court granted the application on September 16.
[22] The version of section 361.4 then in effect stated: "(a) Prior to placing a child in the home of a relative ..., the county social worker shall visit the home to ascertain the appropriateness of the placement. [¶] (b) Whenever a child may be placed in the home of a relative ..., the court or county social worker placing the child shall cause a criminal records check to be conducted .... [¶] ... [¶] (d)(1) If the fingerprint clearance check indicates that the person has no criminal record, the county social worker and court may consider the home of the relative ... for placement of a child. [¶] (2) If the fingerprint clearance check indicates that the person has been convicted of a crime that would preclude licensure under Section 1522 of the Health and Safety Code, the child shall not be placed in the home. [¶] (3) Upon request from a county, the Director of Social Services may waive application of this section pursuant to standards established in paragraph (1) of subdivision (g) of Section 1522 of the Health and Safety Code...."

Section 361.4, subdivision (d) now states, in pertinent part: "(2) If the fingerprint clearance check indicates that the person has been convicted of a crime that would preclude licensure under Section 1522 of the Health and Safety Code, the child shall not be placed in the home, unless a criminal records exemption has been granted by the county, based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child, pursuant to paragraph (3) of this subdivision. [¶] (3)(A) A county may issue a criminal records exemption only if that county has been granted permission by the Director of Social Services to issue criminal records exemptions.... The county shall evaluate individual criminal records in accordance with the standards and limitations set forth in paragraph (1) of subdivision (g) of Section 1522 of the Health and Safety Code, and in no event shall the county place a child in the home of a person who is ineligible for an exemption under that provision."
[23] The Agency argues that In re Joel H., supra, 19 Cal.App.4th 1185, 23 Cal.Rptr.2d 878 and In re Jonique W., supra, 26 Cal.App.4th 685, 31 Cal.Rptr.2d 601, are inapposite because they were decided before the 1997 amendment to section 387, which relieved the Agency of the obligation to show that the relative placement was ineffective. In re Joel H., supra, 19 Cal.App.4th 1185, 23 Cal.Rptr.2d 878, remains as viable authority for the proposition that the first phase of a section 387 hearing is reviewed under the substantial evidence standard. (In re Joel H., at p. 1199, 23 Cal.Rptr.2d 878.) We do not rely on In re Jonique W., supra, 26 Cal.App.4th 685, 31 Cal.Rptr.2d 601. We need not discuss whether, in the case of relative placement, the present version of section 387 entails a showing only "that the placement is not appropriate in view of the criteria in Section 361.3" or whether a showing "that the previous disposition has not been effective" may be substituted. Here, under either measure, the Agency's showing was deficient. In any event, the Agency's form petitions in this case used only the language "[t]he previous disposition has not been effective."
[24] These directives, and their aftermath, are somewhat unclear as to content and timing. The record variously states that Grandfather was not to be left alone with the children and Grandmother was not to leave the children in his care. It states that Grandmother left the children alone with him, she said he was caring for the children, and the children were found in his care "as the only adult provider." Elsewhere in the record, it is apparent that Grandmother's biological children helped care for Aaron and C.A.
[25] Nor need we discuss Miguel's counsel's citation of Kimberly R. v. Superior Court (2002) 96 Cal.App.4th 1067, 1077, 117 Cal.Rptr.2d 670 for the proposition that removal under section 387 is not warranted unless there is risk of substantial harm. We note, however, that that case concerned removal from a parent, which is not the situation here.