Filed 6/16/21  In re D.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.B.,<br><br>    Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>    Defendant and Appellant. | A160657<br><br>(Marin County Super. Ct.<br> No. JV26710A) |

The juvenile court sustained an original dependency petition filed by Marin County Health and Human Services (the Department) for half siblings T.H. and D.B. and found they came within the court's jurisdiction under Welfare and Institutions Code section 300, subdivision (b).[1]  On disposition, the children were given in-home placement with their father, R.H. (Father), and D.B.'s mother, J.B. (Mother).

---

[1]    All further statutory references are to the Welfare and Institutions Code.

Months later, after the juvenile court denied the Department's request to dismiss T.H. and D.B.'s dependency cases, the Department filed subsequent petitions under section 342 asserting additional grounds for jurisdiction. It also filed supplemental petitions under section 387 seeking to place the children outside the home. The juvenile court sustained the petitions and removed the children from their parents' custody.

Father appealed the orders sustaining both the section 342 and section 387 petitions. We affirmed the orders as to him in our prior unpublished opinion, *In re T.H.* (Mar. 26, 2021, A160513, 2021 WL 1153228) [nonpub. opn.] (*T.H.*).

Mother now appeals the order sustaining the section 387 petition. She contends the order removing D.B. from her custody was not supported by substantial evidence. We also affirm.

## BACKGROUND

A detailed discussion of the facts related to this dependency is set forth in *T.H.*, *supra*, 2021 WL 1153228, which we incorporate and adopt by reference. Here we repeat many facts from that opinion verbatim, and include additional facts which are specific to D.B. and Mother and bear on the issues Mother raises in this appeal.

### A.    The Original Dependency Petition

In August 2018, when this dependency case began, T.H., then 11 years old, and D.B., then 3 years old, were living with Father and Mother and Mother's parents in a house owned by J.B.'s mother. T.H.'s biological mother, Cara L., had not been in contact with her son for years.

The Department had received its second referral regarding the family in five months. Community professionals were concerned about the safety of the children's home, which had been " 'yellow tagged' " due to rot, an exposed

2

ceiling, and mold in a bedroom. Clutter and trash filled the house. There were also concerns about D.B.'s development and hygiene, and suspected drug use by the parents.

Around this time, police had searched the house, which happened because Mother was on probation for drug possession and being under the influence of a controlled substance. During the search, Mother displayed "obvious symptoms" of drug use—she could not sit still, fidgeted, and moved her tongue in and out of her mouth. Mother reported that she used the day prior and was cited for being under the influence of a controlled substance.

As part of its investigation, a Department social worker contacted the therapist who had been counseling Mother for months. The therapist thought Mother had been rapidly deteriorating in recent weeks and was concerned she had relapsed after not using methamphetamine for years. Mother smoked marijuana daily, had open wounds on her hands, arms, and face, and was not maintaining her hygiene. She also had a history of psychosis, and auditory hallucinations had reappeared. The therapist expressed concern for both children and for D.B.'s lack of development in particular.

During a home visit, the social worker discussed the reasons for the referral. Father said most of the clutter belonged to his mother-in-law, the home's owner who hoarded. D.B.'s development was a concern, as she had missed a recent speech and development appointment. Mother reported feeling stressed out and concerned about her health. She had been diagnosed with schizophrenia, anxiety, and depression, for which she took a variety of prescribed medications nightly. She also had been suffering from increased auditory and visual hallucinations. She acknowledged smoking marijuana three or four times a day and drinking two to three glasses of alcohol a day.

However, Mother did not believe her marijuana use impacted her ability to care for the children. She understood that she should take her medications only after she stopped drinking for the day and denied that mixing substances impaired her ability to parent. She also denied using methamphetamine and reported that she had previously completed a substance abuse program.

Medical records later reviewed by the social worker indicated D.B had a developmental delay which appeared to be impacting her behavior. It was recommended that D.B. have a speech and language evaluation. Mother had also been advised to enroll her in daycare or preschool to increase her exposure to children her own age.

After the home visit, the social worker discussed the Department's recommendations with Father on a phone call. The Department wanted the clutter cleared from the children's rooms. The Department also requested both parents consent to be drug tested. After hesitating, Father said he would test.

In late August and early September 2018, through a series of telephone calls, home visits, and outreach to other service providers aiding the family, the Department worked with the parents to address its recommendations. The parents made progress on clearing the children's rooms of clutter and by mid-September had completely cleaned up D.B.'s room. But on other issues, they made no progress. Both declined to consent to drug tests, which Father believed infringed on his rights. There was still a lot of clutter in the house, as well as the problem with the bedroom ceiling and mold. D.B. had again missed her speech and development appointment.

Based on its ongoing concerns for the children's well-being, the Department filed a dependency petition for both children on September 14,

4

2018, alleging they came within the juvenile court's jurisdiction under several subdivisions of section 300.

At the September 2018 detention hearing, the juvenile court followed the Department's recommendation and kept the children in Father's and Mother's custody. It further ordered family maintenance services, which included substance abuse testing and treatment and parenting education for both parents. The court understood Father's opposition to drug testing but explained it was the court's job to ensure the children were safe. It needed testing to understand whether the parents were using drugs and if so, to what extent, and whether their use compromised their ability to care for the children. Mother indicated her understanding that she was to undergo substance abuse testing and treatment as well as mental health services. The court said the clutter and mold were being addressed too slowly, notwithstanding the positive improvements made in recent months. It also pressed the parents to get the children to their medical appointments.

The Department's jurisdiction report, filed October 17, 2018, recommended the juvenile court take jurisdiction over both children. The jurisdiction report detailed the parents' progress towards their case plan goals since the initial petition. Clearing and repair work were still underway at the house. The children made it to most of their scheduled health and developmental appointments. D.B. attended her developmental assessment and was referred to speech therapy, but Mother was uncomfortable dropping off D.B. at a school for therapy so declined the referral. Mother stated that when she had been told that neither parent could attend the therapy session with D.B., they opted not to pursue it. Both parents stated they would agree to the therapy if one could be present during appointments. However, neither parent was worried about D.B.'s speech. They said she spoke but was

5

shy around strangers. During the social worker's visit, D.B. appeared clean and properly dressed, healthy, and happy around her parents.

Father and Mother also explained they found the Department mischaracterized their substance use in the initial petition. Mother stated that she smoked " 'a little' " marijuana in the morning, and then again at night after the children were in bed. She stated that smoking marijuana helped her not use methamphetamine, which she last used five years prior. While she did not feel she had to drug test, she was willing to do so for a period of time.

Mother's therapist subsequently reported Mother had been doing " '100% percent better' " and was " 'back to her old self.' " According to the therapist, Mother was "again presenting as clean, nicely dressed, and sober." Mother shared that she had been stressed about strangers from law enforcement, code enforcement, and the Department entering her home, as well as issues with her own mother. However, Mother was coping better and continuing with her weekly therapy. The therapist had no concerns about Mother abusing substances.

In the report's assessment, the Department saw many strengths in the family, including "strong and positive relationships" between everyone. The parents were attentive to the needs of both children, who appeared comfortable and happy. Still, the state of the home and missed appointments remained problems. The Department was also concerned "that the parents' ongoing marijuana use[] and possible use of other substances" could be "hindering the parents' ability for timely follow through on the home and the children's needs." For these reasons, the Department recommended the court take jurisdiction of the children while they remained in the home.

At the October 2018 hearing, the court recognized the parents had made some improvements but found "there [was] a whole lot that [had] not been done" since the last hearing. The court admonished the parents for mess still in the house and suggested they move elsewhere if the house was uninhabitable and the debris not removable. The court admonished the parents for failing to bring the children to all their appointments and pressed them to take D.B. to her speech therapy. The court also directed the parents to look into preschool for D.B., noting most children her age were in some type of preschool. Regarding drug testing, the Department indicated that referrals for both parents to test were made regardless of their feelings about it. When the court sought confirmation that the parents were clear on testing, Father responded, "We're clear."

In its November 2018 disposition report, the Department commended the parents on the progress they had made in all areas of concern. They continued to clear the clutter from the home. No one slept in the yellow-tagged room anymore, and a baby gate had been installed to block access to the room. The parents were observed to interact with care and attentiveness with the children. They set appropriate limits with them and the children were generally happy. The parents also took the children to medical, dental, and developmental appointments. They had an appointment scheduled to discuss a speech therapy referral for D.B.

The Department's social worker saw many family strengths, "primary among them . . . a strong and positive relationship between [Father] and [Mother], and a strong positive relationship between both children and [their parents]." It also believed the children were safe in their home with parents who interacted appropriately and positively with them and appeared attentive to their needs.

7

Nonetheless, the Department was still concerned about the home's safety. Also, the parents still had to enroll D.B. in preschool and follow through on the speech therapy referral, given the impact her speech delay could have on her future growth and well-being. The Department added, "Underlying these concerns is the possibility that the parents' ongoing marijuana use, or potential use of other substances, may be slowing their ability for timely follow through on the children['s] needs." The Department requested the court declare both children dependents of the court.

The jurisdiction and disposition hearing was held in December 2018. The parents submitted on an amended section 300 petition, which alleged there was a substantial risk T.H. and D.B. would suffer serious physical harm due to the parents' failure to provide them with adequate shelter and medical and dental care, and because the parents were unable to care for them due to their substance use and abuse. The court found the amended section 300(b) allegations true and sustained the petition as to both children. After declaring the children dependents, the court issued its disposition order for continued in-home placement with formal supervision. The court further found family maintenance services must be provided. A court appointed special advocate (CASA) was appointed for each child.

**B.      Unsuccessful Request to Dismiss the Dependency Cases**

Approximately six months later, the Department recommended dismissal of both dependency cases. The "Family Maintenance Review/Dismissal Report," filed in May 2019, concluded that the Department's involvement in the family was no longer necessary.

The home remained only somewhat cluttered. The yellow-tagged bedroom was noticeably cleared but not repaired due to lack of funds and J.B.'s mother's resistance to securing the necessary permit. The Department,

8

however, did not deem the home unsafe for the children because the damaged room was blocked by a secure gate.

The parents had also largely been meeting the children's medical, dental, and educational needs. D.B. was up to date on her medical appointments. She had been assessed with a speech delay and recommended for speech therapy. The social worker observed "striking improvement" in her speech but still noted a speech delay persisted since the majority of D.B.'s speech was unintelligible to the social worker. The parents, however, had not followed through with the referral. The Department also noted that the parents continued to resist preschool for D.B. and had failed to secure the preschool spot offered her because they had not submitted required documentation for enrollment. They considered transportation to and from the program too difficult, and Mother believed it would be a challenge for D.B. to attend because she got upset leaving her parents. While the Department found these decisions unfortunate, neither constituted a safety hazard or placed D.B. at risk of harm. Moreover, the social worker found D.B. to be happy, energetic, playful, and much less shy than in the early days of the dependency case.

The Department acknowledged that both parents indicated a willingness to drug test but regularly declined for a variety of reasons. They continued to acknowledge regular marijuana use but claimed they used no other substances that would require testing. Neither believed their marijuana use impacted their parenting. They believed smoking helped them cope with stress and abstain from other drugs. Mother's therapist no longer believed she was using methamphetamine since initially raising the concern when the dependency case began.

In the Department's assessment, the children were safely and appropriately cared for by both Father and Mother. The parents had made "marked improvement" in attending to the children and were meeting their basic needs. The children's CASA agreed with the Department's dismissal recommendation.

At the June 2019 hearing on the Department's dismissal request, the court noted the parents' good work but did not believe D.B.'s needs were being met. The court asked the parents why D.B. was not in speech therapy or preschool. The court viewed these as "two important pieces that have not yet happened . . . because otherwise [D.B. was] going to be extraordinarily disadvantaged when she start[ed] kindergarten." The court also instructed the parents to take pictures of the house. The dismissal hearing was continued to allow the parents to address the court's concerns.

The Department filed a supplemental memorandum in advance of the next hearing. Speech therapy could not begin for D.B. until school resumed in the fall. D.B. was on a waitlist for preschool, and the parents still need to submit documents to enroll her. The Department had not yet received the house photos they requested from the parents.

At the July 2019 hearing, the court denied the request to dismiss the dependency cases. The court noted it had asked the parents "for months and months" to enroll D.B. in preschool, and learning that the paperwork had been finally submitted the day of the hearing was "very distressing" and did not "speak highly of [the parents'] ability to manage [the] children." The court also noted its request for photos of the home to make sure it was "an environment that was physically safe for the children." The two undated photos of a fraction of the house which were shown to the court on a smartphone were not satisfactory. The court stated to the parents, "You have

10

not addressed the issues which brought you to this Court's attention. I'm inside very angry with you right now because you've been given a lot of support, a lot of optimism and you can't do those three simple things I asked you to do."

Two months later, the Department filed a supplemental memorandum updating the court on the parents' progress. D.B. began attending preschool and received a new referral for speech therapy.

At the September 2019 hearing, the court again declined to dismiss the dependency petitions. The parents did not demonstrate adequate progress to the court. The court recognized D.B. was in preschool but was frustrated she still had not begun speech therapy, which had been ordered a year ago. The court was also presented with photos of the house at the hearing but wished they had been submitted earlier.

The parents' "lack of follow through" prompted the court to question why the parents could not get "simple things" completed. The court explained, "Here's what I see. I see that you both have a history of drug abuse, that you are refusing to test, and it makes me wonder if that is . . . what is going on in the home, because you are not taking care of the kids in a way that meets their basic educational and medical needs." The court asked the parents why they were not drug testing, and Father responded, "I think it's a slap in the face. He explained he had not been in trouble for drugs for almost 20 years. The court ordered they test. To the parents, the court further added, "[I]f you want to show me that you can get things done, you can take care of business . . . I would like to have some clean tests." Both parents indicated they could comply.

11

In an effort to get D.B. into speech therapy, the court assigned the CASA her educational rights. It also ordered six more months of family maintenance services.

## C.  Section 342 and Section 387 Petitions

In the months following the unsuccessful dismissal request, the parents' progress came to a halt. On February 20, 2020, both children were detained and placed in foster homes.

On February 24, 2020, the Department filed section 342 petitions for both children asserting new, independent allegations for the court's jurisdiction. It also filed section 387 petitions seeking the children's removal from Father's and Mother's custody. The amended section 387 petitions alleged the children's prior dispositions had been ineffective. The petition for D.B. attributed this to both Father and Mother's refusal to drug test or otherwise address their substance abuse, despite the Department's efforts to provide them transportation for this service. It further alleged both parents continued to minimize D.B.'s needs and had not demonstrated minimal benefit from the many services provided them to address the risks to D.B.

The Department submitted its section 342/387 detention reports for both children which explained the events leading up to the new petitions.

Mother's long-time therapist reported that Mother regularly described periods when Father went away and did not tell her where he was going or when he would return. Twice Mother showed up to sessions with an overnight bag and indicated she was going to leave for a few nights to " 'show [Father] what it's like.' "

According to D.B.'s report, there continued to be difficulties getting her to speech therapy. The parents remained "unable or unwilling" to have her evaluated, despite "extensive services" provided by the Department, which

12

included coordinating with the school district, D.B.'s medical provider, her CASA, and the family case manager. Mother represented on the referral that D.B. had no developmental delays or unmet developmental needs, notwithstanding the concerns D.B.'s medical providers had repeatedly expressed about her development for over a year and her diagnosed speech delay. Only when D.B.'s CASA intervened and resubmitted the referral was D.B. assessed by the school district. D.B.'s teachers agreed that she needed an assessment for her communication because she seemed to "have needs that [were] either related to speech or her processing of language." They noted D.B.'s significant progress in preschool and insisted that she stay in school, in light of a threat Mother made to withdraw her.

Registering D.B. for kindergarten was also a challenge. Mother did not respond to outreach from the family case manager, who had to visit the family at home to get the parents to register D.B. by the approaching deadline. Mother did not get out of bed, and Father was unable or unwilling to participate. Eventually, Mother registered D.B. for school but not without "intense guidance and consistency" from the case manager.

While D.B. attended some of her health appointments, she missed two. The Department was also concerned about D.B.'s safety after learning that Mother had driven her daughter, even though Mother did not have a driver's license.

The parents persisted in their refusal to be drug tested despite even more extensive efforts by service providers to facilitate the process. In late September 2019, the Department arranged for the parents to get tested at a closer, local facility, but neither parent responded to the Department's outreach. At a scheduled home visit, the social worker discussed test logistics with them and told them they would have 24 hours to report to the local

13

testing site after being notified of their required test date. They were also told if they failed to report, the Department would consider that a positive test for illicit substances. When they were informed of their test date, both said they could not go. Mother said she had to take D.B. to a playdate. When encouraged to test while the children were in school, Mother indicated the bus stop, about 0.7 miles away, was too far from the house. Neither parent ever reported to the local site to test. In another attempt, the Department arranged for a taxi paid for by the Department to take them to a test site. Neither followed through with the arrangement. The family's wraparound services clinician also "did extensive work" with the parents to facilitate the testing, and offered to set up the appointment and provide transportation there. The test site attempted to reach the parents but never heard back.

In the Department's view, "the previous in-home disposition ha[d] not been effective in remedying the issues in this case. The progress . . . made [was] largely attributable to outside service providers completing steps for the parents. The Department ha[d] not observed any increase in insight or responsibility on the part of [Father]. There continue[d] to be pervasive issues of neglect, which the parents seem[ed] unable or unwilling to acknowledge, which indicate[d] that an in-home disposition is no longer suitable in this case. The Department remain[ed] increasingly concerned about the impact of the parent's mental health issues as well as the parents' resistance to engage in drug testing and/or substance abuse treatment." At the February 2020 hearing, the court detained both children.

The jurisdiction and disposition reports for each child, filed in March 2020, recommended the court sustain the section 342 and 387 petitions. According to the reports, the children lived apart from each other in separate

14

placements. D.B. was moved from a foster home to be with her godmother in Sonoma County.

D.B.'s report included the results of her evaluation for an individualized education program (IEP). She qualified for one due to "serious developmental delays in her speech, communication, hyperactivity, and possibly intellectual ability." She scored "Extremely Low" in verbal comprehension, fluid reasoning, and processing speed with scores in the 0.1st, 1st, and 0.5th percentiles, respectively. She scored "Low" in working memory, sentence expression, and sentence comprehension, with scores in the 4th, 3rd, and 2nd percentiles, respectively. The IEP assessment team offered several recommendations to D.B.'s home care providers to address her development needs.

To support its section 387 petitions, the Department largely repeated the many challenges described in the February 2020 detention report getting the parents to drug test. The Department recommended out-of-home placement as the most appropriate disposition for both children.

The Department's addendum reports updating the status of each child were filed on late May 2020. D.B. continued to do well in her placement with her godmother in Sonoma County. She was in preschool and being assessed for mental health services.

Meanwhile, Mother revoked the release that had allowed the Department to speak with her mental health providers. This left the Department unable to confirm Mother's ongoing participation in therapy.

On June 2, 2020, the court conducted a joint jurisdiction and disposition contested hearing. Mother objected to the court taking jurisdiction under the 342 petitions and removing the children from her custody under the 387 petitions. Neither parent called any witnesses.

15

The court sustained the amended section 342 petitions for both children. The sustained amended petition for D.B. alleged she was at risk under section 300(b) based on Mother's mental illness and Father's undiagnosed and unmanaged mental health symptoms.

The court also sustained the amended section 387 petitions for both children. In its disposition orders, the court found that placing the children at home would be contrary to their welfare, and removal from the parents was necessary. The court found each child's out-of-home placement appropriate. The parents were ordered to participate in reunification services. Mother also indicated she was willing to sign a limited release that would allow the Department to confirm her attendance at therapy and her progress towards meeting her goals.

Mother now appeals.

## DISCUSSION

Mother argues there was insufficient evidence to support the court's order removing D.B. from her custody. We disagree.

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. [Citations.] In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. [Citations.] If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate. [Citations.] A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency, because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that

16

the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161 (*T.W.*); § 387; Cal. Rules of Court, rule 5.565; see also *In re Miguel E.* (2004) 120 Cal.App.4th 521, 542.)

"When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361." (*T.W., supra*, 214 Cal.App.4th at p. 1163.) Under section 361, before a minor can be removed from a parent's custody, the court must find by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *T.W., supra*, at p. 1163.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

On appeal, we review an order sustaining a section 387 petition for substantial evidence. (*In re D.D.* (2019) 32 Cal.App.5th 985, 990.)

The record here provides more than substantial evidence that D.B. was at risk of facing substantial danger to her physical health, safety, protection, or physical or emotional well-being if she were to remain in her Mother's care, despite Mother's apparent love and devotion to her daughter. Much of the same evidence we determined supported D.B.'s removal from her Father's custody applies to Mother as well. Like Father, Mother submitted to and the court sustained the original dependency petition on grounds that her

17

substance use and abuse put the children at substantial risk of serious physical harm or illness. Further, her substance use continued to be an ongoing issue. She acknowledged daily use of marijuana and alcohol, while refusing or resisting drug testing over the course of a nearly 18-month dependency case and despite the repeated orders and the tremendous efforts undertaken by her social worker, case manager, and other service providers to facilitate the process. Absent testing, the court was unable to determine whether Mother was using or abusing other substances and reasonably construed her persistent refusal to test as evidence of substance abuse. (See *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384 ["As we have previously explained, a missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result[.]' "].)

In addition, there was substantial evidence that D.B.'s in-home placement with Mother was no longer effective in protecting D.B. D.B.'s IEP evaluation showed severe developmental delays that had been unaddressed for many months while in her parents' care, despite the efforts by the Department, medical providers and CASA, and orders from the court. The IEP evaluation made apparent D.B. had significant developmental needs which could adversely affect her future growth and well-being and which required the attention and commitment of her caregivers. Yet Mother had a poor track record of timely addressing her daughter's education and developmental needs. For over a year, she resisted or took no action in getting D.B. evaluated for speech therapy and other developmental delays. When D.B. was finally assessed—nearly 18 months after the court ordered her parents to do so—the scope and severity of D.B.'s developmental delays were notable, making the parents' neglect in following through on the speech therapy referrals all the more distressing. Also, while Mother managed to

18

register D.B. for school, it required "intense guidance and consistency" from the case manager. Despite the significant improvements D.B. had shown at school, Mother still threatened to withdraw her. This evidence was sufficient to establish D.B. was at risk of harm if the prior disposition leaving her with Mother had been maintained.

The record also provides substantial evidence that there were no reasonable means by which the D.B.'s physical health could be protected without removing her from Mother's custody. A parent's past conduct, including history of compliance with the child welfare agency, is relevant when evaluating whether alternatives to removal exist. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order. (*Ibid.*) Here, the Department made reasonable efforts to prevent the need for D.B.'s removal. After the court exercised jurisdiction over D.B. and declared her a dependent of the court, the Department recommended and the court ordered in-home placement with formal supervision and family maintenance services. With D.B. in her custody, Mother failed to sustain the progress necessary towards meeting her case plan goals. While she regularly attended therapy, not once did she comply with the court's order to drug test even though she had a history of drug use, admitted to using when the dependency was initiated, and acknowledged daily marijuana and alcohol use throughout the dependency. Further, the Department and the court had already attempted D.B.'s in-home placement, during which time Mother either minimized or disregarded D.B.'s developmental needs. This was sufficient evidence to support the court's finding that no reasonable means to protect D.B. were available without removing her from Mother's custody.

19

Mother argues, "The court and the [D]epartment were concerned mother was using alcohol and marijuana while caring for the children, that the parents had not made progress in securing safe housing or that mother had adequately addressed her mental health issues.  But none of these issues were substantial, clear and convincing evidence that showed [D.B.] would be at risk of substantial harm if she was placed with mother while mother completed services."  She adds that the home was determined to be safe for the children.  Even if the family home was habitable and safe, there was still substantial evidence Mother was unable to provide proper care for D.B. and proof of a potential detriment to her if she remained there with Mother.  Mother's disregard of D.B.'s significant developmental needs, discussed *ante*, is a clear example of that.

Mother also contends there were reasonable means to keep D.B. safe without removing her, since she was "already under the supervision of the court and the [D]epartment," and "[i]t was likely [she] and [Father] had incentive to comply with the court orders in order to continue having [D.B.] in Mother's custody."  The record does not support her contentions.  Under Mother's supervision, D.B.'s developmental needs were disregarded for over a year, even though the Department, the CASA, and the court pressed her to follow through on the speech therapy referrals.  In addition, over the course of the in-home placement, Mother demonstrated no compliance with the court's drug testing order, even with D.B. actively under the court's jurisdiction and with the ever-present prospect of removal.  We do not consider it reasonable to return D.B. to the same situation in which service providers and the Department were continuously required to intervene and work over Mother's resistance or inaction to ensure D.B.'s developmental needs were being met.

20

**DISPOSITION**

The juvenile court's findings and order as to the section 387 petition related to D.B. are affirmed.

_____
Petrou, Acting P.J.

WE CONCUR:


_____
Jackson, J.


_____
Wiseman, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.