Filed 9/17/25  In re I.J. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re I.J., A Person Coming Under the Juvenile Court Law. | B338809, B341638 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 24CCJP01152A) |
| Plaintiff and Respondent, | |
| v. | |
| S.J., | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Syna N. Dennis, Commissioner. Affirmed.

Kristie A. Lutz, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

S.J. (Mother) appeals from the juvenile court's findings as to a Welfare and Institutions Code[1] section 300 amended petition regarding then six-year-old daughter, I.J. (case No. B338809). Mother also appeals from the jurisdictional findings and orders sustaining a subsequent section 342 and supplemental section 387 petitions and removing I.J. from her custody (case No. B341638).

Mother contends the jurisdictional findings under the initial petition lack sufficient evidence. We decline to address this issue because substantial evidence supports unchallenged jurisdictional findings on that petition as to Father R.Y. We also find no merit in Mother's contentions that the findings and orders as to the section 342 and section 387 petitions lack sufficient evidence. Substantial evidence supports the findings that ongoing unsanitary and unhealthful conditions of Mother's home and Mother's unresolved mental health issues placed I.J. at serious risk of harm, and there is clear and convincing evidence that removing I.J. from Mother's custody was necessary to ensure the child's well-being. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Initial Referral and Investigation

In late February 2024,[2] the Los Angeles County Department of Children and Family Services (DCFS) received a referral that Mother's home posed an unsanitary and unfit environment for I.J. Specifically, Mother hoarded perishable and spoiled food items; there was a persistent cockroach infestation in Mother's unit that spread to other units in the apartment building despite multiple efforts to fumigate during the two years

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

[2] Unless otherwise noted, date references are to 2024.

Mother resided there. Mother risked losing her public (Section 8) housing due to prior violations for these issues.

It was also reported I.J. walked around the property barefoot, wearing clothing that was dirty, urine-soaked and inappropriate for the weather. The child was ungroomed, with dirty, matted hair that might contain cockroach eggs. Mother had recently removed I.J., who is on the autism spectrum, from school and supportive services she received there, and was having the child home-schooled.

On February 27, a DCFS children's social worker (CSW) met with Mother in her home. The CSW observed some of the rooms were unclean and unsanitary with excessive trash, clothes and toys on the floor. There were piles of canned and boxed food on the floor, and roaches on the floors, walls and personal items. Mother explained she kept excess food in case of an emergency and recently had gone through the food items to ensure nothing was expired. Mother claimed the building had a roach problem when she moved in, and the insects came from other apartments. Mother denied any mental health history. She said she was capable of caring for I.J. but acknowledged needing some supportive services to care for I.J.

Mother conceded I.J.'s hair, purportedly styled in dreadlocks, was matted. She had difficulty styling the child's hair because I.J. had an aversion to being touched and did not like to sit still. Mother claimed the child's hair was clean. Mother said I.J. disliked bathing but was nevertheless kept clean by Mother using soap and water to wash her or by bathing her, even when I.J. threw tantrums. However, Mother could not remember when I.J. had last been bathed. She also said the child's clothes were laundered regularly, but that clean clothes and toys were left on the floor because I.J. "had organization issues," and threw tantrums if Mother tried to clean or organize. She said the child

3

was up to date on her physicals, and had sensitive skin which resulted in rashes, a condition known to I.J.'s physician. Mother said she lacked time for errands or chores because caring for I.J. was a full-time job. She conceded she struggled and needed support to care for I.J. In March, I.J. had been denied Regional Center services for reasons unknown to Mother, who had been advised to reapply in May. Mother said I.J. had previously attended elementary school, and had an Individualized Education Plan and had received supportive educational services. However, Mother withdrew the child from school because the child was frequently ill and had complained of being bullied. Mother said I.J. was now home-schooled but spent time outside and enjoyed playing with other children. Mother had begun receiving help from "Apple Joy Consulting Services," and said they would continue to help her clean the home and engage I.J. in play therapy.

The CSW observed roaches near where I.J. was playing. I.J. had a short attention span and did not respond to questions, so it was unclear if the child understood what was said. The CSW saw no roaches or eggs in the child's hair. Mother was told to clear and clean the floor, so roaches did not nest there.

Mother reported one previous DCFS referral regarding domestic violence by Father, which had been deemed "inconclusive." After that incident, Mother and I.J. had limited contact with Father, and I.J. had not seen Father for about 1.5 years. Mother did not know his current whereabouts or contact information.

On March 5, the CSW spoke with Donnesha Sloan, a behavioral specialist working with I.J., who explained I.J. was a high functioning child with autism. I.J. had the ability to engage, but Mother was "enabling" I.J. because the specialist would make

4

progress with I.J., only to have Mother intervene and encourage I.J. to regress. Mother failed to place any boundaries on I.J.'s behavior. Mother "seem[ed] lazy" and did not want to cook or clean, and fed I.J. " 'enormous amounts of food and [gave] her juice every 10-15 minutes.' " Mother was difficult to work with. I.J. was never bathed and always had dirty nails, skin and hair. Mother let I.J. stay awake until 3:00 a.m. and only woke the child at 2:00 p.m. when the specialist arrived. Sloan's agency had been forced to hire cleaners to make the house suitable before the specialist could begin work with I.J. The house had a foul odor, was roach-infested and Mother hoarded food items. Mother asked Sloan to clean the home and insisted she help I.J. with schoolwork. Sloan opined Mother seemed to struggle with some mental health issues.

I.J. had a forensic exam at the HUB clinic on March 21. The doctor reported the exam was very limited due to I.J.'s noncompliance, Mother's inability to calm I.J. throughout the exam, and the fact that Mother remained seated despite several requests for her to help hold I.J. for the exam and photos. The doctor observed dark brown lesions on I.J.'s neck. The doctor tried to examine and wipe the lesions with a wet paper towel, on the chance they were just dirt, but I.J. pushed the doctor away. Based on the limited examination, the lesions appeared to be a rubbing abrasion injury to the neck. The doctor could not rule out abuse due to I.J.'s inability to provide a meaningful statement. Mother was uncertain when I.J. had last been bathed, explaining it was hard to bathe the child due to her autism and sensory avoidance behaviors. Mother did not appear to be appropriately engaged or interactive. Mother's general behavior raised concerns of possible neglect, specifically, "Mother [was] unable to meet [I.J.'s] daily needs." The doctor reported Mother would benefit

from parenting classes and education on autism and sensory avoidance behaviors to assist I.J. with activities of daily living. I.J. also would benefit from increased therapies for her sensory avoidance behaviors.

DCFS offered Mother voluntary family maintenance services; she refused.

On March 28, the CSW made an unannounced visit to Mother's home. I.J. still appeared unclean, and her matted hair did not appear to have been combed since the CSW's prior visit. The child wore only underwear but bore no observable marks or bruises. Common areas in the apartment were "fairly clean and free of clutter," and Mother had tidied I.J.'s bedroom and cleaned the floor. However, the roach infestation remained unabated, and roaches crawled among piles of food on the floor. Mother said she had discarded any food that roaches could access and declined to throw more away. She claimed food on the floor was stored in sealed packaging which the roaches could not get into. Mother said she could not afford to buy the airtight food storage containers the CSW suggested.

## II.    Pretrial Events

On April 12, DCFS filed a nondetain petition, pursuant to section 300, subdivision (b)(1), alleging I.J. was at risk of harm due to the "filthy, unsanitary and hazardous" condition of Mother's home, including a cockroach infestation in and foul odor emanating from the home, and food, debris and dirty clothes on the floor. On May 21, DCFS filed an amended petition adding allegations that Father knew or should have known about the home's unsanitary conditions and failed to protect I.J.

On April 26, the juvenile court found Father to be I.J.'s presumed Father, released I.J. to Mother's care and ordered referrals for Regional Center services, programs to permit I.J. to

6

socialize with other minors, and services to assist with effects of detention, including a HUB medical evaluation, and ongoing care. The court ordered a minimum of thrice weekly monitored visits for Father.

### III. Jurisdictional/Dispositional Hearing on the Section 300 Amended Petition

A combined jurisdictional/dispositional hearing on the amended petition was conducted on May 22. In advance of the hearing Mother submitted several photos taken on May 7 depicting various areas in her home, and her refrigerator and freezer.

In its May 17 report for the hearing, DCFS informed the court a dependency investigator (DI) visited Mother's home on May 14 and observed I.J.'s hair remained matted, and fluid which looked like ear wax dripped from her ear. Mother denied the poor condition of I.J.'s hair and ear but said the child had frequent ear infections. Mother stated there were "no dirty clothes, [and] no food debris," and everything in her pantry was nonperishable. As for the roach infestation, Mother claimed the building had a roach problem before she moved in. She had gotten the property manager to spray for roaches and had fog "bombed" the apartment herself three times.

Mother blamed the foul odor in her apartment on food that spoiled due to delayed servicing by building management after her refrigerator stopped working. Management had previously replaced the refrigerator twice and wanted Mother to pay for a third. Mother said her home was always clean, the food was not expired, and she had just cleared out a pile of nonperishable food on the floor. The DI observed a roach infestation. Mother continued to reject the DI's concern that roaches could access the packaged food on the floor. The DI saw piles of trash bags

containing toys in I.J.'s bedroom. Mother explained she left I.J.'s toys out because the child wanted them that way and threw a tantrum if her toys were not where she left them. Mother's and I.J.'s clothing was piled on the floor in Mother's closet. Mother did not use hangers because I.J. disliked them.

As for Father, Mother told the DI the parents had not been in contact since DCFS investigated past allegations of domestic violence. Father said he did not want to be a part of I.J.'s life and had not seen the child for about 1.5 years. When Father was interviewed, he told DCFS he had last visited I.J. when Mother lived elsewhere, and her prior home had not been unsanitary. Father stated the child's poor hygiene and matted hair had always been an issue. He tried to comb I.J.'s hair in the past, but she refused to stand still. Father had stayed away from I.J. in order "to keep the peace." He acknowledged he should have known about the circumstances alleged in the petition and protected his daughter.

On May 10, DCFS re-interviewed behavioral therapist Sloan. Sloan had to terminate the child's in-home services due to Mother's refusal to answer her agency's calls or open her door for appointments, and because Mother tried to control Sloan's sessions and prevented the therapist from doing her job.

Sloan's agency sent someone to clean Mother's home before Sloan could begin her sessions with I.J. because the home was " 'disgusting' " and roach infested. Sloan conducted sessions with I.J. outside because the home smelled so foul and she was " 'rained on by roaches[]' " when the patio door was opened. On one occasion, Mother cleaned the kitchen with a pair of I.J.'s old underwear, which she also used to smash roaches. Mother then used the same rag to clean I.J.'s ear, from which wax was always

dripping. Mother refused to give I.J. a bath or brush her teeth or hair, claiming the child would do it when she wanted to.

The CSW remained concerned about the condition of Mother's home, which showed no improvement over multiple visits. During the most recent visit, the child had tissue stuffed into her ear, which Mother attributed to an infection. Mother left clothing, toys and bags of items strewn throughout the home, and refused to throw them away claiming I.J. would cry. However, when the CSW asked Mother to demonstrate the child's distress by throwing a balloon away, I.J. did not react. On May 14, the CSW tried to have Mother meet with a Child and Family Team to address case issues. Mother continued to deny problems existed and refused services unless ordered by the court.

Paternal Grandmother told the DI that she worried Mother did not " '[r]egister[] things in her brain.' " Mother had declined Paternal Grandmother's offer to help with childcare and no longer answered Paternal Grandmother's calls. Paternal Grandmother said Mother had experienced an unspecified "tragic health concern" a year or two earlier. Paternal Grandmother thought that event may have impacted Mother's mental health and ability to parent because, shortly after, Mother began to shut down, stopped speaking to Paternal Grandmother and displayed erratic behavior. Paternal Grandmother had never been inside Mother's home but noticed a strong odor from outside. I.J.'s hair was always a matted mess; Mother did not know what to do with it or how to comb it. Paternal Grandmother said Father chose to distance himself from Mother after she accused him of domestic violence.

A management representative at Mother's apartment building told the DI that other tenants had complained about roaches coming from Mother's unit. Some neighbors tried to help

Mother clean but were unable to get through spaces filled with litter until building maintenance moved things. Mother did not want to clear out cabinets for fumigation and expected building maintenance staff to move items. Management had fumigated Mother's apartment multiple times and had given her fumigation bombs. Cleaning services had been hired to clean Mother's apartment and provide cleaning tips. The property underwent fumigation annually, but Mother called management weekly to ask about fumigating. Mother was currently on her third refrigerator due to roach infestations. Mother regularly brought home boxes of food from a food pantry and had been told not to leave the boxes in the home because some food spoiled, creating a risk of flies and maggots.

The property manager and assistant manager told DCFS that I.J. was regularly seen barefoot, wearing soiled clothing. Mother, who walked around wearing very revealing clothing, had gone to parties on the property uninvited, insisted other children play with I.J. and had tried to leave the child behind on her own. Management was concerned I.J.'s matted hair might contain roaches, and that the child might be sickened by her access to spoiled food. After Mother decided to have I.J. home-schooled, service providers who came to her home were forced to sit on the porch because of the roach infestation indoors. I.J. yelled, threw tantrums and both she and Mother lacked social skills.

The property manager informed DCFS that, to keep her housing voucher, Mother had to maintain the apartment in a livable condition but had not done so. Management had been patient with Mother and tried to accommodate her, but directives appeared to go over her head. The roach infestation in Mother's home put her in jeopardy of losing her housing. Management had offered to provide Mother help through the Children's Institute;

she refused. Management wanted to help rectify problems but the issues involving Mother were out of hand.

Mother denied the DI's May 14 request to photograph the condition of her home. The property manager gave DCFS photos of the unit taken during a February 2024 inspection, showing the same piled food on the floor which Mother was asked to clear in May.

## IV. The May 22 Combined Adjudication/Dispositional Hearing

During the jurisdictional phase of the joint hearing on May 22, Mother's counsel offered recent photographs to support Mother's claim that her home was no longer in an unsanitary condition. Counsel requested the petition be dismissed because the home was clean and the issues alleged in the petition arose solely because of Mother's poverty.

DCFS argued its concerns related to Mother's inability to grasp the harmful impact of the home environment on I.J. In addition, DCFS argued that, rather than accepting responsibility, Mother denied there was any roach problem, shifted blame for the condition of the home and the child's poor hygiene to I.J. herself, and resisted DCFS's offers of services and its efforts to help Mother work with I.J. to address behavioral issues. DCFS also expressed concern that I.J.'s poor hygiene and matted hair–which might harbor roach eggs–demonstrated that the child was a victim of severe neglect.

The court accepted Mother's representation that her home was now clean, specifically stating its exercise of jurisdiction was not "because the house [was] filthy." The court noted the amended petition raised issues beyond the fact that the home was dirty. However, apart from the sustaining unchallenged allegations that Father knew or should have known about the

11

unacceptable conditions in Mother's home, the court did not identify its specific concerns before sustaining the amended petition.

Proceeding with disposition, I.J. was declared a dependent of the court and the court ordered a period of family maintenance services. Mother's case plan consisted of family preservation, anger management, parenting a child with autism, and individual counseling (including domestic violence and past trauma), a mental health assessment and recommended treatment program, and an order to maintain a clean and habitable home. I.J. was released to parental custody and permitted to remain in Mother's home. Mother filed her initial appeal.

## V.     Family Maintenance Period

On May 15 the HUB doctor assigned to evaluate I.J.'s mental health contacted Mother to schedule the evaluation. Mother declined the evaluation. She was given until May 23 to reconsider but never responded. On May 23, HUB informed DCFS that, after several unsuccessful attempts to contact Mother, it had been unable to schedule a medical appointment for I.J., and the referral was returned.

During a scheduled home visit on June 5, the CSW noticed additional piles of food in the home. The rooms were dirty and cluttered, and there were roaches throughout the home, crawling over toys and clothes on the floor, in cabinets, on walls, rugs and doorframes and in the refrigerator. Mother denied having bought extra food, but the CSW observed the refrigerator and cabinets were packed with food. Mother then said she was unable to get I.J. to go outdoors and needed the extra food to feed the child indoors for several days.

Mother remained resistant to DCFS's provision of services. The CSW gave Mother materials regarding her case plan programs. Mother refused to sign an acknowledgment that she had received the materials. She claimed her attorney instructed her " 'not to sign anything or talk to anyone,' " a phrase she repeated every time the CSW inquired about case plan participation by Mother and/or I.J. Mother also denied that Father had custody of I.J.

I.J. was sleeping and wearing "pull-up" diapers when the CSW arrived. The child was woken but would not speak. When asked why the six-year-old still wore pull-ups, Mother said she wore them at night because she wet the bed. Mother did not have a potty-training plan in place for I.J., nor any intention to establish one. I.J. appeared unkempt, her hair was matted and she had a bloody ear. Mother said I.J. had stuck something in her ear and " 'busted' " her eardrum. Almost immediately, Mother denied making that statement when asked how the injury occurred. Mother then repeated that I.J. had stuck something in her ear and had a " 'busted' " eardrum, an ear infection and bleeding. Mother provided conflicting information about which medical providers the child had seen or said she could not remember.

As for behavioral services for I.J., Mother said the child was not receiving services, and accused the CSW of lying in her reports. Mother then switched the topic back to the child's ear infection and sleeping late due to a cold. Mother repeatedly changed topics, and exclaimed suddenly that I.J. had " 'Autism, Down Syndrome in the heart, and all of that.' " She then switched to discussing I.J.'s ADHD, dyslexia and her decision to withdraw I.J. from school because she was regularly sick and bullied.

Mother said I.J. did not like going outdoors, then said the child was unable to stay indoors.

A service log compiled by management at Mother's apartment building contained a June 20 entry detailing complaints about the cockroach infestation in Mother's home. Management explained to Mother that her unit had to be habitable and would be re-inspected the following week. The log noted that Mother had "c[o]me down and start[ed] yelling and acting in a ballistic manner."

The CSW made a scheduled visit to Mother's home on June 20, but Mother did not answer her phone or respond to the CSW's voicemail. Building management granted the CSW access, and informed her that Mother had refused to vacate her unit for fumigation services and refused to remove food from her floor. Mother's apartment had previously been sprayed without success. Once inside the apartment, the CSW noticed a foul smell, and observed the rooms remained dirty and crawling with roaches. I.J. was again unbathed and her hair was matted. At one point, the CSW intervened after I.J. used a crayon to stab roaches that surrounded her on the floor as she colored. Mother did not react or try to redirect I.J. The CSW observed roaches running over piles of food on the floor and in boxes on the counter and chair. Mother explained she had recently purchased more food to prepare for a tornado. She declined the CSW's suggestion to install shelving for food, claiming I.J. might hurt herself climbing on shelves, even after the CSW noted I.J. climbed on unstable boxes of food on the floor that crawled with roaches.

Mother did not respond when asked about a dental appointment for I.J., then aggressively blurted out that I.J. did not have cavities. Mother acknowledged having received an e-mail from the CSW containing the juvenile court's orders and

DCFS's case plan referrals but said she had not taken I.J. to programs because the child did not want to stay. During the CSW's visit, I.J. began yelling that she wanted to eat, screamed, stopped, then started screaming again. Mother did not react. Eventually, I.J. stopped screaming and began playing on her phone.

The CSW repeatedly expressed concern regarding health and safety concerns due to the condition of Mother's home, and said Mother had to address the issues within 30 days. In response, Mother repeated that roaches could not get into the sealed food items and said she lacked funds to buy shelving or boric acid to sprinkle around the piles of food. Mother was instructed not to use boric acid given that I.J. climbed on the piles of food. Mother was urged to use the referrals she had received or contact the CSW if she needed more. Mother continued to argue about whether she had excess food and complained that Father should not be permitted visitation. The CSW left after scheduling a follow-up visit for early July. The CSW contacted the property manager to see if management could provide shelves for Mother's food. The manager explained that management worked with residents to address concerns and treat infestations, but Mother was about to be in violation for the second time in 2024 due to health and safety issues.

Days later the CSW returned to Mother's home with a letter describing DCFS's concerns about the unhealthy and unsafe home environment, Mother's failure to keep her home and child clean, her refusal to follow through with court-ordered referrals for herself and I.J., and her isolation of I.J. from family members and other children. Again, Mother did not respond to the CSW's efforts to reach her and only opened her door after management gave the CSW access to the property. The CSW

15

reminded Mother she had only 30 days to address DCFS's concerns and about a home visit scheduled for July 3. The property manager informed the CSW that Mother's apartment had failed an inspection. Even though the home remained roach-infested, Mother had told the property manager during the inspection that her home was clean and roach free. Management said Mother was told to remove the food which caused the infestation, and repeated that Mother was at risk of being evicted.

Mother canceled the CSW's home visit on July 3, claiming she had to take I.J. to a medical appointment that morning. The CSW made an unannounced visit anyway and was granted access to the building by management. Mother was home and answered the door when the CSW knocked. I.J. was still asleep and wore a dress and pull-ups, and her hair was unkempt and matted. Efforts to wake I.J. were unsuccessful. Mother explained the child stayed up very late. The CSW asked that I.J. be woken because she should already have been logged in for school, but Mother said it did not matter since I.J. attended online classes. The home remained dirty and piles of food on the floor were crawling with roaches. Mother refused to provide a list of the foods she fed I.J., stating the child was autistic and ate what she wanted. The CSW spoke with Mother about the need to ensure Father had visits with I.J. Mother claimed she had spoken with the Family Preservation and other agencies about appointments but refused to provide detailed information, instead referencing her pending appeal.

On July 9, an In-home Outreach Counselor (IHOC) informed DCFS she had gone to Mother's home after Mother finally agreed to participate and to meet weekly to address barriers. The home remained infested with roaches, and Mother

began fumigating with Raid while the IHOC and I.J. were inside the unventilated home. Mother continued to blame her neighbors for the roach problem, but the IHOC told her the infestation was due to the food on the floor. When the IHOC raised issues regarding services for the family and shelving, Mother declined services but expressed interest in obtaining shelves. The IHOC felt a bump on I.J.'s head which was irritating the child's scalp under her matted hair.

The CSW arrived unannounced at Mother's home the next day and saw dead roaches in front of the door, and piles of food on the floor and counters. Mother reported she had used a fumigation bomb (fogger), but roaches still crawled on the walls. Mother rejected the CSW's suggestion that she throw away food, stating instead she needed to shop for cereal and could simply cover the piles of food. I.J. remained asleep throughout the CSW's visit.

On July 10, a Specialized Foster Care worker told the CSW Mother had agreed to schedule an appointment for I.J. but thereafter ceased answering calls. Mother told the CSW she refused to let Father see I.J. and sent the CSW a YouTube video purporting to explain the benefits of roaches. During a family preservation meeting on July 12, Mother argued about the safety of her home and repeated that Father should not see I.J.

A report from I.J.'s Multidisciplinary Case Planning Committee meeting indicated I.J.'s learning delay was a behavioral concern. The goal was to return I.J. to school and promote speech and social interaction by referring the child to a school for children with autism. The report also included the CSW's approval for the IHOC to work with Mother to obtain funds for a cabinet for food. The CSW learned I.J. had last been examined by an ear, nose and throat doctor in late 2022 and

2023, and had been referred to an otologist for "possible typanoplasty [*sic*] for TM perforation." There was no indication Mother ever followed up.

On July 18, the IHOC arrived at Mother's home for a scheduled visit. Initially, Mother refused to give her access but let the IHOC inside after management gave the IHOC access to the building. I.J. was asleep when the IHOC arrived at 10:00 a.m. Piles of food on the floor were covered with roaches. The IHOC explained to Mother the goal was to address the roach infestation by throwing away food, but Mother resisted. Mother also refused the IHOC's request to examine the insect infestation and excrement in cabinets, the refrigerator and on the floor, and refused to help clean. The IHOC killed roaches and swept and bagged food on her own. I.J. remained asleep into the afternoon. The IHOC insisted Mother wash bottles of water, explaining she could not give them to I.J. with roach excrement on the bottle. The IHOC stopped Mother when she started to cook some meat because roaches crawled in the frying pan she used. Mother discussed the YouTube video she had sent the CSW explaining the health benefits of roaches. The IHOC told Mother her home required a professional exterminator, but Mother refused to give building management access to have the fumigation done.

On July 25, I.J. was detained from Mother's care. At the time of removal, the CSW noticed additional boxes of perishable and nonperishable food on the floor. The boxes were covered. The CSW moved one cover and saw the food was crawling with roaches. Mother argued her home was clean and roach free. At the time she was detained, I.J.'s body emitted a foul smell, and she had a dark line across her neck. The child was placed in the home shared by Father and Paternal Grandmother. Later that day, Paternal Grandmother told the CSW the foul odor had come

18

from I.J. and her filthy clothes, which contained roaches. Refuting Mother's claims that I.J. disliked water and refused to bathe, Paternal Grandmother reported she had given I.J. a bath and the child loved the water and being clean. The mark on her neck had been dirt.

## VI.   DCFS Files Section 342 and Section 387 Petitions

On July 29, DCFS filed a subsequent (§ 342) petition, alleging again that Mother created an endangering unhealthy and unsanitary home environment and had failed or refused DCFS's efforts to remediate the roach infestation in her home. The petition also alleged Mother had mental and emotional problems but refused to undergo an assessment. (§§ 342, 300, subd. (b)(1).) DCFS also filed a supplemental section 387 petition alleging Mother failed to comply with her case plan, refused to permit Father's court-ordered visitation with I.J., and had failed to remediate the roach infestation in her home. (§ 387.) DCFS recommended Mother be ordered to undergo mental health and psychological examinations. DCFS also recommended I.J. be placed in Father's care, and Mother be given monitored visitation. On August 12, the juvenile court detained I.J. from Mother, released her to Father's custody, and scheduled an adjudication hearing on the section 342 and section 387 petitions.

## VII.  Postdetention Investigation

On September 9, the CSW met with Mother at her home. Mother denied the allegations in the new petitions and the need for DCFS's intervention. She denied hoarding, acknowledging only that she kept " 'extra food' " for emergencies because of increased storms the year before. She assured the CSW that food items in the home were unexpired, and claimed that " 'everything [was] organized . . . not on the floor [but] in boxes [and] not dangerous.' "

19

In response to questions about her failure to address the roach infestation in her home, Mother claimed she had tried to get rid of the roaches but got no help from her landlord. She then contradicted herself, saying the landlord had arranged for someone to help her clean and fumigate, but they " 'didn't want to move things around,' " and recommended she declutter. Mother claimed to have eliminated the clutter and denied having been told her home required fumigation. She then said she fumigated herself after the landlord gave her bombs. She denied there were any roaches on the walls or tables. When it was pointed out to Mother that she was simultaneously claiming that she did and did not have a roach problem, Mother again blamed neighbors and said her home was free of roaches. Mother denied having used a pan containing roaches to cook. Mother insisted she had not done and would not do anything to harm I.J. She claimed baby roaches did not harm children, which was why she sent the YouTube video to the CSW: " '[roaches are] good. Scientist[s] feel they are healthy. I'm not saying they are but [they] are not bad creatures.' "

Addressing the allegations in the subsequent and supplemental petitions regarding her mental health, Mother conceded she was stressed about the situation with DCFS. She denied any mental health problems; she was " 'perfect.' " Mother also said she did not undergo a mental health evaluation because she had believed the evaluation was for I.J., then acknowledged needing her own evaluation. Mother insisted she was " 'not crazy,' " and was a " 'good parent' " who kept her child safe; her house was full but organized and not unhealthy.

When asked about her compliance with the case plan, Mother reported she was homeschooling the child and denied the allegation that she refused services. She acknowledged having

gotten off to a slow start, claiming she had done her own research regarding the juvenile dependency case because she did not believe she was guilty of the things alleged. Mother claimed her attorney had said she had six months to comply with her case plan and Mother believed she had more time to complete the programs. She explained, " '[t]hat's why [she] hesitated because [she] talked to [her] lawyer and we were doing an appeal. It takes like a year for it to come through.' " Father told DCFS that Mother did not permit his court-ordered visits with I.J. When asked about this, Mother changed the topic but also denied isolating I.J. from Father, claiming she was misinformed and had not been consulted about the visitation schedule.

As for I.J., Mother explained she decided to homeschool the child after I.J. reported being bullied by other children and school staff who were not " 'sympathetic or empathetic to her needs.' " Mother believed I.J. was doing well, and denied having isolated the child. Mother encouraged I.J. to meet others but did not take I.J. out when " '[I.J.] [did not] want to do it because she's autistic . . . .' " The DI observed that, throughout their conversation, Mother frequently changed topics, repeated herself, was unable to remain focused on questions and avoided answering others.

Following the September 9 visit, DCFS reported Mother had not complied with the court-ordered case plan, declined mental health services or an evaluation, and her home remained uninhabitable due to roach infestation and clutter.

On September 10, the property manager informed DCFS that Mother's apartment had failed inspection due to the roach infestation and clutter. Management had tried to work with Mother to declutter her home, get rid of food items and fumigate her unit, but Mother refused the help sent by management.

Property management was now working with the Section 8 program to have Mother evicted.

The CSW reported Mother had been referred for mental health counseling on August 23, began some services on September 9 and was scheduled to begin a parenting class for autistic children on September 13. Mother had enrolled in another parenting class after I.J. was removed and had attended four sessions since August 12. Mother visited and regularly called I.J.

The CSW encouraged Mother to continue to participate in services and obtain necessary services for I.J. Mother continued to display behavior and moods indicating unmet mental health needs. I.J. had been exposed to unhealthy living conditions in Mother's home, and the CSW expressed concern about the child's poor hygiene and Mother's failure to teach the child basic skills for living.

The CSW reported that Mother still had not "put [I.J.] in services, [that] Mother was supposed to have a psychological evaluation, and never followed through with the treatment plan.'" In addition, the court had ordered visits for Father, but "'[Mother] wouldn't do it.'" Mother kept I.J. isolated even after the CSW encouraged her to put I.J. in programs with her peers. Mother denied any mental health problems and referred to her higher education as a reason she did not have mental health needs. The CSW believed Mother needed an Evidence Code section 730 evaluation, noting a prior DI too had expressed concerns about Mother's mental health. Mother was at risk of losing her home which management considered inhabitable. Management had tried to work with Mother to clean the home, but she continued to hoard food.

Paternal Grandmother was not aware of any mental health diagnosis for Mother but believed she faced mental health challenges. Paternal Grandmother lost contact with Mother after she stopped allowing Paternal Grandmother or Father to visit. Paternal Grandmother said Mother had been abusive toward I.J.'s Maternal Grandmother and took her apartment. Paternal Grandmother said " '[Mother] tried to stab [Maternal Grandmother], fought [Maternal Grandmother], and [Maternal Grandmother] gave up and went to live in a shelter and told [Paternal Grandmother] [she'd] rather be there than be abused by [Mother].' " In early September, Mother called Paternal Grandmother from an unknown number and acted erratically.

During her visits with I.J., Mother refused to help with I.J.'s homework, saying I.J. would do homework if she wanted to. Paternal Grandmother had cut the child's badly tangled and matted hair. I.J. did not seem to know about personal hygiene and was not fully potty trained. Paternal Grandmother was working with I.J. on tasks like wiping herself and showering independently and had no current concerns about I.J. bathing. DCFS said I.J. was adjusting well to living with Paternal Grandmother and Father. The child was progressing in her development, appeared calm and content in the home and was learning to socialize with peers.

Father and Paternal Grandmother were in the process of obtaining a new Medi-Cal card for I.J. (which Mother had refused to hand over) and would schedule medical and dental services after they received the card. DCFS was in the process of making a new HUB referral because Mother had not followed up regarding audiology for I.J.'s ruptured eardrum. In addition, Mother chose to use over-the-counter eardrops to treat I.J.'s ear, instead of drops prescribed for the child. I.J. was referred to the

Department of Mental Health Services on June 25. Mother had not followed through so DCFS was in the process of making a new referral.

DCFS reported that a DI visited Mother's home prior to adjudication of the section 342 and section 387 petitions. Some paths had been cleared around the clutter, but conditions were otherwise not much better. Roach feces and eggs and expired food remained, and Mother continued to deny there were any concerns she needed to address.

In a Last Minute Information filed August 12, DCFS reported that Mother continued to engage in troubling and aggressive behavior. On July 30, law enforcement was called after Mother trespassed to enter Paternal Grandmother's gated community, then sat on the porch refusing to leave. During an August 4 visit with I.J. at the park monitored by the CSW, Mother failed to engage with I.J., did not console the child who got upset after dropping an ice cream, inappropriately told I.J. she would be returning home to Mother the following week, and refused to assist the CSW to calm or help transition the child when the visit ended and I.J. got upset about leaving Mother. During an August 9 supervised park visit, Mother got angry at and yelled at the CSW after she suggested that Mother participate in the child's play. Mother screamed at the CSW in I.J.'s presence, blaming her for taking I.J. away. I.J. screamed and refused to leave at the end of the visit. Mother accompanied I.J. to the CSW's car but refused to latch the child's seat belt so the CSW could leave. When the CSW attempted to secure the belt herself, Mother became physically aggressive, pushed the car door and tried to pull the seat belt out of the CSW's hands. DCFS concluded that, given Mother's erratic behavior and escalating aggression, it was no longer safe to permit visitation in the community. DCFS recommended Mother's monitored visitation

24

be restricted to DCFS's offices and again requested Mother undergo a full psychiatric assessment.

## VIII. The Sections 342 and 387 Adjudication Hearing

The combined jurisdictional/dispositional hearing on the section 342 and section 387 petitions was conducted on September 23. Mother offered photographs taken earlier in September purporting to show her home had recently been cleaned and was roach–free. Mother argued removal of I.J. was unwarranted because she had begun participating in court-ordered programs but continued to insist no Evidence Code section 730 evaluation was necessary. Mother's counsel requested the sections 342 and 387 petitions be dismissed.

I.J.'s attorney noted Mother's home had failed another inspection earlier in September and remained uninhabitable. I.J.'s counsel also noted Mother's failure to follow through with a Fall 2022 medical recommendation that I.J. be examined for a perforated eardrum, even though fluid continued to seep from the child's ear well into 2024. Counsel for DCFS and for Father agreed with I.J.'s counsel. In addition, DCFS argued Mother's compliance with her case plan (which had been in place since May), began just weeks before the hearing. Mother admitted she had delayed compliance because she did not believe she was "guilty." Mother continued to deny the need for an Evidence Code section 730 evaluation, claiming she was "perfect." Moreover, as late as September, roaches and expired food remained in Mother's home, yet she remained resistant to fumigation and continued to deny or did not understand the unsanitary state of her home posed a health or safety risk to I.J.

The court agreed with arguments made by counsel for DCFS, I.J. and Father, found DCFS had sustained its evidentiary burden and sustained both petitions. Regarding the section 387

petition, the court found, by clear and convincing evidence, I.J. was at current risk of serious harm, DCFS had made reasonable efforts but there were no reasonable means to assure I.J.'s safety, short of removal from Mother's custody. I.J. was placed with Father and both parents were ordered to participate in case plans identical to those ordered following disposition of the initial petition with the additional condition that Mother undergo an Evidence Code section 730 evaluation.

Mother filed a second appeal.[3]

## DISCUSSION

**I.   Because the Assertion of Juvenile Court Jurisdiction as to the Section 300 Amended Petition Was Proper Based on Father's Conduct, We Need Not Also Determine Whether It Was Proper Based on Mother's Conduct**

As to the amended petition, Mother's sole challenge is to the sufficiency of the evidence supporting the juvenile court's jurisdictional findings that I.J. was at substantial risk of serious harm at the time of the adjudication hearing due to Mother's inability or unwillingness to alleviate unsanitary and unhealthful conditions in her home or address the child's health and behavioral issues. The amended petition was sustained based on the independent conduct of each parent. Mother does not challenge the assertion of jurisdiction based on Father's conduct, and Father has not appealed. Thus, the court has jurisdiction

---

[3]   We ordered the appeals consolidated for purposes of discussion and disposition. We take judicial notice of a June 27, 2025, minute order entered while this appeal was pending, by which the juvenile court terminated its jurisdiction and awarded custody of I.J. to Father.

26

over I.J. and we need not address the evidence supporting its findings as to Mother.

The juvenile court assumes jurisdiction of the child, not the parents. If jurisdiction exists based on the neglectful conduct of a single parent, the appellate court need not consider jurisdictional findings based on the other parent's conduct. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491, overruled in part by *In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*).) Because dependency jurisdiction attaches to the child, not the parents, "a jurisdictional finding good against one parent is good against both." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Mother's challenge to the initial jurisdictional findings is effectively moot.

Moreover, were we inclined to address Mother's contentions as to the initial jurisdictional findings, those findings were superseded by events and conditions after I.J.'s initial detention, which gave rise to the need for filing the well-founded subsequent and supplemental petitions which resulted in I.J.'s detention from Mother based on new facts and supplemental allegations.

We acknowledge that, even where dependency jurisdiction exists because an offending parent has not appealed, this court may nevertheless exercise its discretion to "reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction.' " (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763, first and second brackets added, disapproved on other grounds by *D.P., supra,* 14 Cal.5th at p. 283; *In re J.C.* (2014) 233 Cal.App.4th 1, 4.)

None of these factors applies here. First, Mother does not take issue with the initial dispositional order which left I.J. in her care. Further, given the new facts and circumstances which led DCFS to file the section 342 and 387 petitions and the court's findings and orders as to those petitions, the initial jurisdictional findings have no independent potential future impact on Mother. Even if the court had erred in asserting jurisdiction as to Mother under the amended petition (it did not), that issue became moot because substantial evidence supports its jurisdictional findings as to the section 342 petition.

In dependency proceedings, the basic pleading device to assert that a child falls within the juvenile court's jurisdiction is a petition. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1035.) "It may be an original petition . . . , a subsequent petition for children who are already dependents when there are 'new facts or circumstances' that bring them within a category of section 300 'other than those under which the original petition was sustained' (§ 342), or a supplemental petition when there are facts which indicate that a previous disposition is not appropriate. (§ 387.)" (*Ibid.*)

"In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition." (§ 342.) All procedures and hearings required for an original petition are required and apply to a subsequent petition. (See *ibid.*; Cal. Rules of Court, rules 5.560(b), 5.565(e).) So long as the jurisdictional findings under the section 342 petition are supported by substantial evidence, reversal of jurisdictional findings as to the initial

petition would be futile. Because the juvenile court here relied on new facts and circumstances which arose after I.J.'s initial detention, the jurisdictional findings as to Mother under the amended petition are moot. (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364.)

## II. The Record Contains Sufficient Evidence to Support the Juvenile Court's Findings and Orders Under Section 342 and Section 387

### A. Controlling Legal Principles and the Standard of Review

The juvenile court's exercise of jurisdiction rests on section 300, subdivision (b)(1). In pertinent part, that provision authorizes the assertion of dependency court jurisdiction where a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . as a result of" a parent's "inability . . . to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1)(A) & (D).) A jurisdictional finding under this provision does not require a showing that a parent is "neglectful," "blameworthy," "unfit," or "at fault" for their inability to supervise or protect their child. (*In re R.T.* (2017) 3 Cal.5th 622, 627 (*R.T.*).) The statute merely requires a showing of "[the parent's] 'inability . . . to adequately supervise or protect [the child].' " (*Id.* at p. 629.) The Legislature's omission of a culpability requirement " 'was purposeful.' " (*Id.* at p. 630.)

We review jurisdictional findings for substantial evidence, asking whether the record—viewed as a whole and drawing all reasonable inferences in support of the court's findings—contains " " 'sufficient facts to support [its jurisdictional] findings.' " " (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) We do not reweigh the evidence or exercise our independent judgment. We determine only whether the record contains sufficient evidence,

contradicted or not, to support the findings. (*Ibid*.; accord, *R.T., supra*, 3 Cal.5th at p. 633.) As appellant, Mother bears the burden to show there is no substantial evidence to support the juvenile court's orders. (*In re L.B.* (2023) 88 Cal.App.5th 402, 412.)

Jurisdictional findings must be based on a preponderance of evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.) "On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.] The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*Id*. at p. 1433.) "In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

### 1. The Section 342 Petition

"In any case in which a minor has been found to be a person described by [s]ection 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in [s]ection 300, the petitioner shall file a subsequent petition." (§ 342, subd. (a).) The trial court must "determine whether newly alleged facts or circumstances establish jurisdiction independent of facts alleged in the section 300 petition." (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.) "[A]ll procedures and hearings required for an original

petition are applicable to a subsequent petition . . . ." (§ 342, subd. (b).)

Here, just two months after adjudication of the amended petition, DCFS was forced to file a section 342 petition alleging that Mother exhibited significant mental and emotional problems, including symptoms of disorganized thought and speech and food hoarding behaviors, which rendered her incapable of providing regular care and supervision for I.J., and had failed to undergo a court-ordered mental health assessment. It alleged Mother's mental and emotional problems endangered I.J.'s health and safety and placed the child at risk of serious physical harm, damage and danger. The section 342 petition further alleged that, because of the ongoing and significant roach infestation throughout the home, Mother created a detrimental, endangering, unsanitary, hazardous and unsafe home environment for I.J. Mother permitted the child to climb on roach-infested piles of food and other items and failed to prevent I.J. from interacting and coming into contact with roaches. In addition, Mother placed I.J. at substantial risk of serious physical harm and danger by spraying Raid in the child's presence in an unventilated area.

The juvenile court found Mother's home was more endangering to I.J. than it had been at the time of the adjudication on the section 300 amended petition. The court found Mother's home was infested with roaches, but she had repeatedly refused fumigation; clothes, food, and other items were in piles on the floor where roaches were observed but Mother refused to remove those items; Mother failed to supervise I.J. or prevent her from coming in contact with roaches; Mother sprayed Raid in an unventilated room in the presence of I.J. These conditions placed I.J. at risk of serious physical harm. The court also found Mother "exhibited mental and emotional

31

problems including symptoms of disorganized thought, disorganized speech, and hoarding behaviors, which render[ed] [her] incapable of providing regular care and supervision for the child. On multiple occasions, the Mother was unable to give answers to direct questions, frequently changed the subject of conversation, and made contradictory statements when questioned. . . . The Mother has failed to undergo assessment for mental health and related treatment services."

The court found ongoing health and safety hazards in Mother's home, coupled with Mother's unassessed and untreated mental and emotional problems placed I.J. at risk of serious harm.

Mother maintains there was insufficient evidence to support the court's finding of a nexus between the conditions of her home and a risk of serious physical harm or illness to I.J. She asserts DCFS failed to show "new facts or circumstances" as required by section 342, subdivision (a) as there was no substantial evidence the conditions of her home had worsened since the adjudication of the section 300 petition.

The record reflects otherwise. First, as detailed above, during the period for provision of family maintenance services, the conditions in Mother's home worsened, and I.J.'s poor hygiene did not improve. Mother also refused repeated offers of various types of assistance from DCFS and property management, and the roach infestation spread from her home to the other units in the building.

In addition, I.J.'s poor hygiene and behavioral issues persisted. Mother permitted six-year-old I.J. to remain in her filthy pull-up diapers and refused to implement a potty-training plan. I.J. was seen trying to stab roaches with her crayon. Mother demonstrated persistent denial of and unwillingness to address

I.J.'s poor hygiene, ear infection and behavioral issues even though such efforts were required as a condition of I.J. remaining in her care. Not only did Mother persistently deny the unhealthful and unsanitary conditions in her home, she demonstrated an inability to cease her hoarding behavior when she told the CSW she needed to buy more cereal for I.J. after the CSW suggested Mother dispose of copious amounts of food. Mother's claim that she "continued to provide [I.J.] with . . . a clean home . . ." is contradicted by the evidentiary record.

Throughout these proceedings, rather than accept responsibility for those things within her power to address, Mother chose to blame others or I.J. herself for the child's removal. She claims the entire proceeding arose solely from her poverty, that the CSW and others disliked her, and that DCFS's intervention created "worsening relationships" between herself, her landlord and DCFS itself. Whether Mother was well-liked is immaterial. The record reflects DCFS, and other agencies and specialists made repeated efforts to help Mother rectify unacceptable conditions in her home and to assist with I.J.'s health and behavioral issues. Mother persistently resisted these efforts. Mother's noncompliance with her case plan also extended to her refusal to permit Father visitation, despite his shared custody of I.J.

Second, Mother exhibited troubling mental and emotional problems, including disorganized thought and speech, hoarding behavior and aggression. On numerous occasions, Mother was unable or unwilling to answer direct questions, frequently repeated herself, changed topics and made contradictory statements. Mother also admitted she had purposefully chosen not to comply with the court-ordered case plan because she did not believe she was "guilty" of doing anything wrong. Mother

exhibited troubling behavior when she refused to participate in play with I.J. during two visits at the park, then screamed at the CSW in front of I.J., blaming her for the child's removal. Mother's troubling behavior escalated when she became physically aggressive with the CSW, to the point that DCFS limited her visits to its offices. Although Mother belatedly began participating in some services shortly before the September 23 adjudication, her mental health issues remained largely unassessed and insufficiently resolved, and she persistently resisted undergoing a thorough psychiatric evaluation.

Mother also claims DCFS failed to make reasonable efforts to prevent removal by not helping her obtain shelving, not connecting her to programs, and not helping to purchase products to treat the roaches or fumigate her home. The record reflects otherwise. DCFS made repeated efforts to help Mother clean and obtain storage and asked the property manager to assist in that endeavor and to conduct additional fumigation.

The question under section 300 is whether circumstances subject the minor to the defined risk of harm. (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 805.) Although the child must be subject to a risk of serious harm at the time of the proceeding, "the court need not wait until a child is seriously . . . injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216, disapproved on other grounds by *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18.) "The court may consider past events in deciding whether a child presently needs the court's protection." (*Ibid.*) A parent's past conduct is probative in this analysis. (*Ibid.*)

Under the circumstances and facts detailed above, substantial evidence supports the juvenile court's findings that

Mother's behaviors and the condition of her home put I.J. at serious risk of harm.

## 2. The Section 387 Petition

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. [Citations.] In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. [Citations.] If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate. [Citations.] A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency, because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161, fn. omitted (*T.W.*); see also § 387; Cal. Rules of Court, rule 5.565; *In re Miguel E.* (2004) 120 Cal.App.4th 521, 542.)

"When a section 387 petition seeks to remove a minor from parental custody, the [juvenile] court applies the procedures and protections of section 361." (*T.W., supra*, 214 Cal.App.4th at p. 1163.) Under section 361, before a child can be removed from a parent's physical custody, the court must find by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the

35

minor's parent's . . . physical custody." (§ 361, subd. (c)(1); see also *T.W.,* at p. 1163.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.) As with prior petitions in the action, the court may consider the parent's past conduct as well as present circumstances when considering what orders will sufficiently protect a child. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

As with the section 300 and section 342 petitions, a juvenile court's jurisdictional and dispositional findings and orders under section 387 are reviewed for substantial evidence. (*T.W., supra,* 214 Cal.App.4th at p. 1161.)

The record demonstrates the juvenile court's order removing I.J. from Mother's custody was supported by clear and convincing evidence. Until just before the final adjudication hearing, Mother chose not to comply with her May 2024 court-ordered case plan, and only belatedly began partial compliance with that plan a few weeks before the September 23 hearing. Mother persistently denied the conditions of her home posed any hazard to I.J. Mother also repeatedly refused to undergo an Evidence Code section 730 evaluation even though her hoarding and failure to address the unsanitary condition of her home posed a continued risk of harm to I.J.'s health and safety. Moreover, Mother's behavior evolved from merely uncooperative to increasingly erratic, and she became verbally and physically aggressive with DCFS staff. Throughout this proceeding, DCFS made reasonable efforts to connect Mother with appropriate

36

programs, to provide assistance with cleaning and to help obtain funds or urge the property management for shelving and additional fumigation. Despite this, Mother demonstrated a persistent unwillingness to address the issues raised by the petitions, denied that any problem existed and refused to participate in a psychiatric evaluation to assess her mental health. We conclude that the record contains ample evidentiary support for juvenile court's jurisdictional findings and dispositional order.

## DISPOSITION

The jurisdictional and dispositional orders pertaining to the section 300 petition, the section 342 petition and section 387 petition are affirmed.


RICHARDSON, J.

WE CONCUR:


CHAVEZ, Acting P. J.


GOORVITCH, J.*

---

*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37